[Civ. No. 21155.   Second Dist., Div. Two.   Feb. 6, 1956.]

MELVIN GERALD ALWOOD, Respondent, v. CITY OF LOS ANGELES et al., Appellants.

Roger Arnebergh, City Attorney, Bourke Jones, Assistant City Attorney, Victor P. Spero and Weldon L. Weber, Deputy City Attorneys, for Appellants.

Reed & Kirtland, Robert C. Packard and Henry E. Kappler for Respondent.

ASHBURN, J.—Defendant city of Los Angeles appeals from a judgment rendered upon verdict for plaintiff in a personal injury action. Plaintiff's case is based upon the Public Liability Act, now found in sections 53050-53051, Government Code.[1] Defendant does not directly attack the sufficiency of the evidence to support the verdict (except as to the issue of contributory negligence) and does not claim an excessive award of damages. Counsel do argue that the evidence establishes contributory negligence on plaintiff's part and that it was the sole proximate cause of the accident; but the major contention is that there was prejudicial error in the admission of evidence of other accidents considered by the court to be similar; counsel also assert error in a certain instruction and claim prejudicial conduct of the judge

---

[1]Section 53051. ''A local agency is liable for injuries to persons and property resulting from the dangerous or defective condition of public property if the legislative body, board, or person authorized to remedy the condition:

'' (a) Had knowledge or notice of the defective or dangerous condition.

'' (b) For a reasonable time after acquiring knowledge or receiving notice, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition.''

who is alleged to have shown favoritism toward the plaintiff. Careful examination reveals that these claims are not meritorious and the judgment must be affirmed.

Though the trial was an elaborate one, the evidence is in conflict at only a few points. It appears that the accident occurred on Centinela Avenue, in the city of Los Angeles, about 185 feet south of Culver Boulevard. Centinela runs north and south and Culver intersects in an easterly and westerly direction. Immediately south of Culver on the east side of Centinela is Westerly Sanitarium, which is bounded on the south by an alley extending easterly from Centinela; a sign is there posted designating the alley as ''The Westerly Ambulance Entrance.'' Leading off from the west side of Centinela and opposite the alley is a street known as Wagner Street. The alley and Wagner Street are some 240 feet south of Culver Boulevard. A bridge over Ballona Creek is about a tenth of a mile farther south. Between the bridge and the alley Centinela is 60 feet wide and divided into four lanes of 15 feet each, two on either side of a center line. The lanes next to that line had a cement surface and the outer or shoulder lanes were of asphalt and were bounded by ordinary curbs. On the east side the asphalt ended at about the north line of the alley and opposite the ambulance entrance sign. From that point northward to Culver Boulevard there was a dirt shoulder about 4 feet wide which was bounded on the east by a ditch. Beginning just north of the asphalt the dirt shoulder had a series of ''chuck holes'' immediately adjoining the 15-foot concrete roadway; they extended for about 50 feet, forming a rut, and varied in depth from 1 to 8 inches. Estimates of depth varied, but these figures represent the extremes.

Shortly after 7 a. m. on September 18, 1952, plaintiff was driving his Lincoln car northerly on Centinela, traveling some 30 feet behind another car, and upon the cement roadway with his right wheels just over the dividing line between the cement and asphalt lanes. It was a foggy morning but plaintiff testified that he had visibility of about 250 feet in that immediate area. Other witnesses said it was there wispy or misty; some said the fog was heavy. Plaintiff had driven or been driven over this same route on some 25 previous occasions, but had not noticed the end of the asphalt, the existence of the dirt shoulder, the series of holes or the rut, and had not driven on the dirt shoulder. He testified that there was no noticeable change in color from asphalt

to dirt and that the road seemed level; numerous other witnesses swore to the same effect; also that there was nothing to call attention to the fact that the asphalt ended and dirt began. It is undisputed that there was no official sign or warning of any kind at or near the ending of the asphalt. As plaintiff was traveling along at 25 to 30 miles an hour his right front wheel, and probably the rear one, went into the chuck hole and he drove about 30 feet in the rut with the inside of his wheels rubbing the side of the concrete roadway. He then saw he was on the dirt shoulder and tried to make a gradual left turn. Finally he did make it and that movement threw his car out of control, it swerved over to the west side of the highway and by the time he could right it the car collided with a southbound vehicle, the collision being on the west side of the dividing line. Plaintiff was seriously injured. The condition of the shoulder was such that the trial judge (outside the presence of the jury) described it as a trap. Those holes and that rut had existed for years and no repairs had been made. The city clearly had constructive notice, does not deny it, and failed to remedy the situation as required by law.

Appellant argues first that the condition of Centinela Avenue was not the proximate cause of plaintiff's injuries; that plaintiff's own negligence was "the sole proximate cause thereof." This argument is predicated upon the view that conditions were plainly visible to plaintiff and "so apparent as to itself constitute adequate warning of such change and to render one who ignores such warning guilty of contributory negligence." ▉ Proximate cause, like contributory negligence, is ordinarily a question of fact, as is that of whether a given agency was a sole proximate cause. *Van Cise* v. *Lencioni,* 106 Cal.App.2d 341, 346 [235 P.2d 236]: "Contributory negligence and proximate cause are normally questions of fact, and only in most unusual cases, of which this is not one, do they become questions of law." (See also *Dennis* v. *Gonzales,* 91 Cal.App.2d 203, 207 [205 P.2d 55]; *Abney* v. *City & County of San Francisco,* 115 Cal.App.2d 506, 509 [252 P.2d 654].) The question was treated as factual by appellant's counsel at the trial, for defendant requested and the trial court gave an instruction to the effect that the burden was upon plaintiff to prove by a preponderance of the evidence that the alleged defective or dangerous condition of the highway was a proximate cause of plaintiff's alleged injuries. This case undoubtedly falls

within the general rule and the jury decided both the questions of contributory negligence and of proximate cause in favor of plaintiff. The trial judge did likewise in denying a new trial. The evidence supports these findings.

■ It is a fair inference that the difference between asphalt and dirt shoulder in color and texture and elevation was not enough to attract the attention of an ordinary driver, and that it was not negligence for plaintiff to get into the rut adjoining the concrete strip. This is true whether the visibility was good, as he said, or whether the fog was heavy, as some of the defense witnesses testified. In the latter event there would be more likelihood of a prudent driver getting off the road. The holes extended along the cement for about 50 feet. They varied in depth and plaintiff, as he traveled about 30 feet, was in a rut of varying depths. He explained that he first realized when at a point about 12 feet north of the alley that his front wheel was rubbing on the surface of the road and that the shoulder was not level with the road, whereupon he began to turn his wheels gradually until he perceived that his car was dropping down; that he did not have any realization of the depth it was dropping, but assumed a 2-inch space, or some reasonable amount, and thought that the car would come back and nothing violent occur; when the car did come back onto the concrete the front end swung violently to the left and the car struck an oncoming southbound vehicle. The jurors well could have concluded, on the basis of their knowledge of the common facts of life, that it was reasonable and prudent for plaintiff to try to get back on the pavement. The shoulder was only 4 feet wide and had a ditch at its easterly border. There was nothing to be gained by trying to ride the dirt. A left pull on the wheel did not release the car when in the deeper holes, but when the wheels came close to a level with the paving the restraining force was released enough to cause the car to swerve rapidly to the west and go out of control. These things the jury and the trial judge may have considered as accounting for the accident and as being wholly consistent with ordinary care on plaintiff's part. If it be true, as appellant argues, that plaintiff knew the condition of the road and the rut it does not necessarily follow that it was negligence on his part to get off the paving and into the rut. ■ Momentary forgetfulness of a known danger is not necessarily negligence. (*Hall* v. *Barber Door Co.*, 218 Cal. 412, 420 [23 P.2d 279]; *Neel* v. *Mannings, Inc.*,

19 Cal.2d 647, 655, 656 [122 P.2d 576] ; *Bickham* v. *Southern Calif. Edison Co.*, 120 Cal.App.2d 815, 823 [263 P.2d 32].) It presents a question of fact for the jurors to solve.

Appellant makes this contention concerning notice: "The Westerly Ambulance Entrance sign, white post, power poles, vegetation, ditch, cement pavement, and the replacing of the 15 foot wide asphalt strip and curb by a narrow dirt shoulder (shown on picture exhibits)—all served to notify respondent of the condition of Centinela at that point just as much as did the pavement, curb, parkway and sidewalk in the *City of Alhambra case, supra,* 6 Cal.App.2d 522." This again does no more than raise a factual question for the jury's determination. (See discussion of *Rose* v. *County of Orange, infra,* 94 Cal.App.2d 688, 691 [211 P.2d 45].)

Appellant next contends that "a city is not required by law to improve or make passable the whole width of a street, but has the right (as in the case at bar) to set aside certain portions thereof for vehicular traffic and to leave unimproved other portions thereof." Reliance is placed upon *Waldorf* v. *City of Alhambra,* 6 Cal.App.2d 522, 526-527 [45 P.2d 207], *Williams* v. *San Francisco etc. Ry. Co.,* 6 Cal.App. 715, 721 [93 P. 122], and cases from other states.

The Waldorf case passed upon the sufficiency of the complaint to state a cause of action under the Public Liability Act. The accident occurred at the intersection of Fremont Avenue (running north and south) with Alhambra Road (east and west) ; the automobile in which decedent was riding collided with a pole in the parkway on the south side of Alhambra Road. The only defect alleged was that at that intersection the portion of Fremont which was south of the south curb line of Alhambra Road was approximately 14 feet narrower than the portion which extended northerly from Alhambra and the concrete curbing on the westerly side of Fremont south of Alhambra was about 14 feet easterly of the concrete curbing on the westerly side of Fremont north of Alhambra; there were no lights, barriers, signs, notices, watchman or warnings of any kind or character to give notice to or warn travelers of the narrowness of Fremont Avenue south of Alhambra Road. The court held that no cause of action was stated, but it was careful to limit the ruling to the facts of the particular case and disclaimed any intent to state a rule which would have general application (p. 526). The specific ruling is found at page 526: "Under the law the City of Alhambra, in the exercise of its gov-

ernmental function and discretion, was not required to widen Fremont Avenue south of Alhambra Road to correspond with the width of that avenue north of such road, and is not actionably liable for its failure so to do. Nor do we think that the city is chargeable with liability in failing to maintain barriers, lights or warning signs or notices at the point of 'offset' or 'jog' in the street.'' The case involved no defect other than design, no holes or ruts or the like. A similar ruling was made in *Robertson* v. *City of Long Beach,* 19 Cal.App.2d 676 [66 P.2d 167]. Those cases were reviewed in *George* v. *City of Los Angeles,* 11 Cal.2d 303 [79 P.2d 723], and *Arellano* v. *City of Burbank,* 13 Cal.2d 248 [89 P.2d 113].

The George opinion, at page 309, distinguishes Waldorf and Robertson, saying: ''The factual situation in each of these two cases differs materially from that existing in the present action. It is well settled in this state that when dealing with cases falling under the provisions of the Public Liability Act of 1923, each of such cases must depend upon its own state of facts and that no hard-and-fast rule can be applied in the great majority of cases. [Citations.]''

The Arellano case, *supra,* was taken over by the Supreme Court for the specific purpose of considering the effect of the Waldorf and Robertson decisions upon the facts of that case. It there appeared that plaintiff drove easterly upon Glenoaks Boulevard across Providencia Avenue and onto the private right-of-way of the Pacific Electric Railway Company which extended from the east side of Providencia and in a direct line with Glenoaks as it existed west of Providencia; in other words, at the east side of the intersection Glenoaks divided and abutted the right-of-way on the north and on the south, but as previously indicated the right-of-way itself was in effect a prolongation of the Glenoaks which existed west of the intersection. It will be noted that the accident occurred outside the confines of the public streets, and that the plaintiff was hurt when he ran off the public street onto the railroad's private right-of-way. Judgment in favor of plaintiff·was affirmed and the Waldorf holding was distinguished upon the factual basis that the curb, sidewalk and parkway in front of the property included within the jog or offset in the street constituted a barrier or warning readily visible to an alert driver, while the situation involved in the Arellano case presented no such warning, no elimination

of the hazardous condition and no steps taken "to protect the public against such dangerous and defective condition."

*Williams* v. *San Francisco etc. Ry. Co., supra,* 6 Cal.App. 715, 721, holds that a railway company cannot obstruct a public highway adjoining its right-of-way without being liable for foreseeable untoward consequences, even if the obstruction is placed outside the improved or traveled portion of the highway. The court assumed *arguendo* that the municipality would not be liable for accidents occurring outside the traveled roadway because the traveler goes upon the unimproved portion at his own risk, but it did not have to decide that question. The case seems not to have been cited on this point.

Later cases have established as the law of this state the rule that the municipality is liable for accidents caused by dangerous conditions "outside the traveled portion of the highway if the circumstances show that the driver was not negligent in departing from the traveled area, and if the defects or obstructions are in close proximity to the traveled area and are hidden from ordinary view." (*Alderson* v. *County of Santa Clara,* 124 Cal.App.2d 334, 338 [268 P.2d 792].) It was charged in the Alderson case that the defendant county maintained a public highway in a dangerous and defective condition in that it permitted rocks and boulders to stand on the north shoulder hidden in a growth of tall weeds, and permitted the shoulder to become hollowed by deep depressions and to become improperly graded, constituting a hazard to vehicles using it. Because the plaintiff, while traveling at a reasonable rate of speed struck rocks about 10 inches from the east edge of the pavement with such force that the car bounced and struck a tree about 20 feet from the edge of the highway, it was held that the facts constituted a defective condition contemplated by Government Code, sections 53051 and 53052, "if the county is under duty concerning the area outside the improved portion of the highway." The court said, in reversing a judgment of nonsuit: ". . . a county may be liable for the dangerous or defective condition even though that condition exists off the traveled portion of the highway. Whether the situation requires the application of that rule is a question for the jury [p. 340]. . . . As to cities, 'The obligation to exercise reasonable care to keep streets and sidewalks in proper repair is not confined to defects existing within the limits of the public way. Dangerous or unsafe ditches, excavations, walls or obstructions by the side

thereof are included within the rule of fixing municipal liability. A city "must not create or suffer any pitfall within the traveled portion, or so near to it that a traveler upon the portion customarily used for travel may, although in the exercise of due care, fall therein." ' '' (P. 341.)

*Rose* v. *County of Orange, supra,* 94 Cal.App.2d 688. In this instance the plaintiff at a "T" intersection of two county roads ran across the street and into an open ditch. Judgment in her favor was affirmed, the court saying at page 691: "Not only does the general situation involve questions of fact, but it is rather well established that such a county or public agency has a duty to warn persons lawfully using its streets of a dangerous condition which exists, even if that condition was not created by it or consisted of something which was not within its control. [Citing cases.] It cannot be held as a matter of law that no duty rested on the appellant to give some warning of the condition which here existed. Whether any warning was here given and whether an ordinary stop sign, if it was there, was sufficient under the circumstances presented questions of fact rather than of law." At page 693: "As hereinbefore stated, a duty rested upon the appellant to give some warning of the dangerous condition which here existed."

It cannot be held as a matter of law that appellant had no obligation to maintain the dirt shoulder of Centinela Avenue in traversable condition, or that its failure so to do was not negligence which was the proximate cause of the accident in question.

Appellant stoutly asserts there was error in receiving evidence of similar prior accidents which, as the reply brief states, "were placed at the precise spot of this accident." Appellant's counsel assert that the other accidents did not occur under similar conditions and rely upon *Wilkerson* v. *City of El Monte,* 17 Cal.App.2d 615 [62 P.2d 790], and *Martindale* v. *Atchison, T. & S. F. Ry. Co.,* 89 Cal.App.2d 400 [201 P.2d 48]. ■ It is well established, and appellant does not contend otherwise, that general similarity of conditions is enough to satisfy the rule, identity being impossible and unnecessary. (See *Gilbert* v. *Pessin Grocery Co.,* 132 Cal.App.2d 212, 218 [282 P.2d 148].) Where a dangerous condition of property is involved, there must be proof that there was no substantial change during the interval between the accidents under consideration. ■ In the case at bar this latter requirement was abundantly established; the proof

was that the condition existing on the day of the accident had prevailed for years prior to that date; that there had been no changes therein. The similar accidents proved at bar were evidentiary of the fact of danger in the existing highway condition and of the manner in which it affected the operation of cars exposed to its hazards—in other words, existence of a dangerous condition and cause of the instant accident.

The cases concerning evidence of prior accidents fall into two classes, those whose similarity depends upon the conduct of the participants in the accident, and those whose similarity depends upon the continued existence of a defective property condition. This distinction is drawn in the Gilbert case, *supra,* at page 221: ''In other words, when the similarity depends upon the conduct of the actors in the accident, rather than the condition of the locale, the general similarity rule requires a matching of those elements (such was the Martindale case, *supra,* which involved a railroad crossing accident), but that is not necessary when the sole fact of dangerous condition of the premises is in issue.'' It is there shown that Wilkerson and Martindale fall in the first category. The distinction is emphasized by the ruling in *Dyas* v. *Southern Pac. Co.,* 140 Cal. 296, 304 [73 P. 972], which is discussed at page 219 of the Gilbert opinion.

It is pertinent to observe that in the Wilkerson case plaintiff sought recovery for injuries received when the automobile in which she was riding struck a dip in an intersection, she being thereby thrown to the top of the car, and the question was one of dangerous and defective condition. The trial judge received evidence of previous accidents and in some instances this was without regard to the speed of the respective cars. Speed was held to be the vital factor in the inquiry, and the receipt of evidence without reference thereto was held to be reversible error, but the court said at page 617 (17 Cal.App. 2d): ''In some cases where the cars had been actually seen by the witnesses as they crossed the intersection, testimony was given as to the approximate speeds of the cars, which were not high speeds, and as to the action of the cars when they struck the depression. This testimony was properly admitted.''

The Martindale case, *supra,* did not involve any question of defective or dangerous condition of property and hence the basis for similarity of accidents could be found, if at

all, in the conduct of actors. It will be observed as the discussion proceeds that the trial judge at bar held the proof of other accidents within narrow limits, requiring similarity of conduct of respective drivers, as well as the obvious similarity of the rut and its holes and the effect upon a car caught in their embrace and struggling to get back onto the traveled highway.

One of the accidents of which appellant complains was that of Mrs. Freda Hartwick. On July 29, 1950, she was driving north on Centinela; she had been over the route many times but had never observed the drop-off north of the alley; she was going 30 to 35 miles an hour (the speed defendant claims plaintiff at bar was traveling) ; she was under the impression that the road was level all the way across; a southbound car forced her to the right; she went into the chuck holes, tried to get back onto the cement, lost control of her car and hit another vehicle.

Mrs. Mary L. Merrill, who owned and lived at the Westerly Sanitarium, was driving north on Centinela in May, 1952. She was familiar with the highway condition in front of her property (which extended from the alley to Culver) ; she knew the asphalt paving ended at the alley and that the dirt shoulder was north of it; something, she knows not what, caused her to slide off the concrete and into the holes; she was traveling 20 to 25 miles an hour; she tried to turn back onto the cement and when she made it the car got out of control, went over onto the west side of the highway and when it stopped was headed south. She told her son about the accident; he testified he went at once to look and saw that at the alley the pavement was 1 to 6 inches above the dirt.

Charles C. Brock, who lived on Centinela opposite the rut, saw an accident about one and one-half months before the subject accident. A northbound car going 25 to 30 miles an hour got off the concrete with the wheels rubbing it for 10 to 15 feet; the driver pulled the car out of the rut and when he did so his car went almost to the fence on the west side of the highway and then back to his own side of the road. This evidence had a tendency to prove the effect of the rut upon a northbound car which happened to drop its right wheels in one of the holes, whose driver attempted to get back onto the paving and thereby lost control of his car. It bore upon the dangerous condition of the street and the proximate result of the application of that condition to a

moving car. On defendant's motion this evidence was stricken, the court holding that there was not sufficient foundation to show similarity of conditions. Admonition to disregard the evidence was given immediately to the jury. No complaint is made with respect to this ruling, but it is claimed that error was committed in overruling defendant's objection when the following occurred on direct examination: "Q. . . . You stated that prior to September 18, 1952, had you seen any cars traveling in a northerly direction swerve across, off of the shoulder and across the dividing line of Centinela? Mr. Owen: May it please the Court, I will object to that, unless there is a foundation laid." The time of the incident having been fixed as required by the court, there was no further objection until the close of the direct examination and it took the form of a motion to strike which, as stated, was granted. If there was any error in this episode it was favorable to defendant and affords no ground for complaint on appeal. The trial judge gave defendant a most favorable construction of the prior accident rule, made full application of the Wilkerson and Martindale cases, *supra*, without regard to the distinction later drawn in *Gilbert* v. *Pessin Grocery Co., supra,* 132 Cal.App.2d 212.

Appellant's counsel emphasize unimportant differences between the instant accident and the similar previous ones. They say, in effect, that the speed should be the same, that all accidents under comparison should be in the daytime or at night, or in fog or bright sunshine; they insist that the drivers must be identified and the cause of dropping into the rut must be the same. This process of comparison was pursued in the Gilbert case, *supra,* and held to be merely an effort to "inject a false quantity into the problem now before us." (P. 219.) ▪ The probative value of similar accidents in the case at bar lies in the existence of the rut and its holes, their effect upon a car which happened to get into the rut, the effect of endeavoring to get back onto the paved highway, the sudden release of pressure which throws the car out of control. The manner or cause of dropping into the rut is wholly immaterial, as is the state of the weather or the time of day. There was no error in the receipt of the evidence of the Hartwick and Merrill accidents, or in the ruling upon the objection to the Brock evidence.

▪ Prejudicial error is claimed to inhere in the court's handling of objections and motions directed at the testimony

of Maurice Gerard. He lived at the southwest corner of the intersection for 24 years; described the holes as running 1 to 5 or 6 inches in depth; said they had always been that way (as shown in Exhibits 11 and 19), and that no work had ever been done on that stretch of road. No mention of the ditch on the east side of the shoulder was made until Mr. Gerard was examined on redirect by plaintiff's attorney. The witness was then asked: "And have you seen cars in the ditch next to that?" He replied in the affirmative; motion to strike that answer was made and granted. That ended the redirect examination and the matter should have terminated there but defense counsel was not content. Immediately upon recross-examination he went into the same subject; there was no objection on the ground that the inquiries were not proper recross or upon any other ground; and counsel's approach was unobjectionable (albeit ill advised). On such recross-examination the witness testified: "Q. And you say you have seen a lot of cars drive along with their wheels just off the pavement and on the dirt, that is, the right wheels? A. That's right. . . . Q. And the ones you have seen drive for some distance that way, do they? A. Lots of times they drive all along that way. Q. Drive all the way to Culver Boulevard and nothing happens to them? A. Sometimes they go in the ditch. Q. Sometimes they go in the ditch. The cars you saw, a lot of them go along right up to Culver Boulevard? A. A lot of them went in the ditch. Q. And did you see them go in the ditch? MR. SPERO: Just a moment. MR. PACKARD: Are you objecting to Mr. Owen's questions? MR. SPERO: No. MR. OWEN: I want the facts; that is all I am interested in." No objection or motion to strike was directed to this testimony. Thereupon, defendant's counsel abandoned the subject for the nonce. Upon re-redirect examination the following occurred: "Q. Now, in connection with the cars in the ditch, have you ever gone over and made any assistance to them? A. I dragged a few of them out. MR. SPERO: Just a moment. Your Honor, we object to that. THE COURT: You opened it up. Q. By MR. PACKARD: And how many cars would you say, how many cars would you say you had pulled out of the ditch in the 24 years that you have lived there? MR. OWEN: May it please the Court, despite the fact—— THE COURT: No, I will overrule that. You played with dynamite. MR. OWEN: I am going to cite that remark of the Court—— THE COURT: The jury will disregard that. MR. OWEN: ——as preju-

dicial.'' Immediately the trial judge gave an appropriate admonition to the jury which ended with these words: ''I will overrule any objections to any further questions along those lines, because you have opened the question and the jury now has the right to hear all the witness' testimony on that subject.'' Defense attorney agreed that that was a correct statement of the law, but the question was raised as to who had actually opened the subject and the reporter's notes were read in the absence of the jury, followed by this: ''THE COURT: Doesn't that open it up? MR. SPERO: No. THE COURT: Of course it does. You can't leave it with the impression that cars went along there with one wheel in the ditch and all went through safely. . . . You would leave the implication with the jury in that case that the cars could drive along there with their wheels there. Maybe they can, but if there were any disasters that the witness knows about, you are going to have to hear them, if the witness knows about it, after that question.'' These remarks of the judge show the soundness of the ruling. It was proper for defendant to develop, if it could, that cars would travel in the rut all the way to Culver Boulevard without disaster and that plaintiff, in the exercise of ordinary care, should have done that very thing. There was no objection by plaintiff's counsel to that examination, and the subject being a legitimate one, and having been opened by defendant, plaintiff had a right to further canvass the matter. There was no error in these rulings, certainly no prejudicial error.

▆▆▆ Appellant makes much of the judge's remark, ''You played with dynamite,'' claiming that it evinced prejudice in plaintiff's favor and conveyed that impression to the jury. A careful examination of the transcript fails to sustain this contention. On the contrary, it discloses that the trial judge throughout the 735 pages of testimony displayed a penchant for commenting on the evidence, its meaning and effect, to such an extent that the small ''dynamite'' exchange could have little effect upon the jurors. So far as the matter of prejudice is concerned, there is no substantial support for that claim in the record. The trial judge repeatedly interrupted plaintiff's attorney in his examination of witnesses, required him to reform legitimate questions, forestalled his pursuing correct objectives, all to such an extent that he had difficulty in proving his case. It may be readily conceded that this did not emanate from any desire or intention to

impede counsel's progress; these matters are cited merely to show that there is no substantial basis for claiming that the judge was prejudiced against the defendant or that his conduct could instill any such thought in the jurors' minds.

Appellant further complains of what appears to have been an oral interpolation in the formal jury instructions— reading as follows: "I heard no evidence submitted on either side in this case that this was a zone restricted to any limit of speed." This followed immediately after the giving of BAJI[2] instruction Number 144, defining and quoting the basic speed law covered by section 510, Vehicle Code. No instructions were given or asked on prima facie speed limits, and the court's remark doubtless was intended to guide the jurors upon that subject, for it had been raised from time to time during the trial. In his opening statement plaintiff's attorney had said that the accident was in an area of 55-mile speed limit. Defendant's attorney in his opening statement said: "that on the day of this accident he was driving, by his own admission, between 35 and 40 miles an hour in an area where there were stores and residences, where he should have been driving only 25 miles an hour on a good, bright day, and on a day when there was fog he should have been driving even less than that." The transcript does not contain the arguments to the jury and hence we do not know what claims were then made with respect to speed or speed limits. On cross-examination plaintiff was asked his impression of the speed limit as he drove along just before the accident, and he stated he had no impression as to the exact limit, that he had seen no signs indicating the speed limit. He was then asked whether he took that to be a 55-mile zone because there were no speed signs there. Objection to that question was sustained. Upon redirect he testified that he had no recollection of seeing any speed signs and that there were no houses on his right as he drove the block just prior to the accident. Police Officer Boardman was asked about the matter of speed signs south of the alley on the east side of the street; he said that he did not know whether there were any or whether that was a 55-mile zone. The court interrupted this line of examination and pointed out to counsel for plaintiff that "unless there is evidence to the contrary you can suppose it is open territory," and "why prove it

---

[2]Book of Approved Jury Instructions, Superior Court, Los Angeles County.

when you don't have to prove it? If anybody wants to prove it they can prove it." Thereupon counsel for plaintiff abandoned that line of inquiry. The court's statement of the law was correct (*Reynolds* v. *Filomeo*, 38 Cal.2d 5, 11-13 [236 P.2d 801]; *Daniels* v. *City & County of San Francisco*, 40 Cal.2d 614, 624 [255 P.2d 785]), and it included no misstatement of fact. The subject not having been otherwise covered by the instructions the court had discretion to clarify the matter if he saw fit. "In charging the jury the court may of its own motion instruct them as to all matters of law which it thinks necessary for their information in giving their verdict." (*Jennings* v. *Arata*, 83 Cal.App.2d 143, 146 [188 P.2d 298].) There is no merit in this claim of error.

The judgment is affirmed.

Moore, P. J., and Fox, J., concurred.

The petition of appellant City of Los Angeles for a hearing by the Supreme Court was denied March 28, 1956.