[Civ. No. 21970. Second Dist., Div. Two. Dec. 3, 1956.]

DANIEL CLAUDE GALLIPO, a Minor, etc., Appellant, v. CITY OF LONG BEACH et al., Respondents.

Simpson, Wise & Kilpatrick, George E. Wise and Adrian Kuyper for Appellant.

Walhfred Jacobson, City Attorney, and John R. Nimocks, Deputy City Attorney, for Respondents.

FOX, J.—Plaintiff appeals from a judgment of nonsuit in an action filed under the Public Liability Act (Gov. Code, § 53051 et seq.). The action was brought on behalf of a minor to recover for damages sustained as the result of a fall from a bridge owned, operated and maintained by the defendant city.

The issue involved is whether the bridge and an attached pipeline constituted a dangerous or defective condition of which the city had notice. The amended complaint charged the defendant knew that the structure was a menace within the Act by reason of its construction, state of repair, narrowness, lack of safeguards, and the absence of pedestrian crossings.

The accident here involved occurred on the California Avenue bridge, which was constructed prior to 1913 by the Pacific Electric Railway over the tracks of its right of way. Outside the railing of the bridge, on the west side, is a gas pipe and supporting structural members. The defendant city has operated and maintained the bridge and its appurtenances since 1924. The roadway portion of the bridge, which is approximately 20 feet wide, constitutes a two-lane arterial street used by north-south vehicular traffic, and carries several thousand vehicles daily. It appears that this is the only bridge in Long Beach upon which there is no provision for a pedestrian walkway. The north approach is within the city of Signal Hill.

The photographs in evidence and the testimony disclose the following physical features at the scene of the accident: The vehicular highway is a paved street which narrows down at the bridge entrance. The bridge spans a railroad right of way, with a drop of about 25 feet to the ground below at its highest point. There is a wooden railing on each side of the vehicular portion of the bridge. The roadway approaching the bridge has no sidewalks, nor is there any pedestrian passageway along the bridge. Adjacent to the lower railing on the west side of the bridge, and running parallel to and almost horizontal with it over the railroad right of way, is a pipeline about one foot in diameter. This pipeline, which is just outside the bridge railing, is attached to the bridge by a supporting structure, a part of which consists of two horizontal planks, one on each side of the pipe. The plank nearest the roadway extends the full length of the bridge; the outer plank extends from the south end of the bridge northward about three-fourths the length of the bridge. There is no barrier at either end of the approaches to the bridge or pipeline to prevent pedestrians from walking upon the pipeline or the two beams flanking it and attempting to cross over in that manner. The grass alongside the bridge has been flattened and beaten into what appears to be a defined path leading up to the pipeline structure. However, near the

center of the bridge and outside the west railing there are two parallel 2 inches by 4 inches beams about 5 feet apart which connect the bridge and pipeline structure. The beams slant across the pipeline to form an obstacle to passage. They are attached at one end to the outer wooden beam beside the pipeline and at the other near the top of the bridge railing. Several strands of barbed wire were loosely strung between the two boards and dangled over the edges.

Plaintiff is an 8-year-old boy who had lived for three years one block south of the bridge. He had been advised by his parents not to play on the bridge. For approximately two years before the accident, he had walked along the pipeline to cross the bridge about once or twice a week. He had a "favorite spot" on the other side of the bridge, where he played with his friends. He did not tell his parents he went upon the pipeline. A couple of times before the accident he had lost his balance while crossing but regained it without mishap. When he came to the loose-ended barbed wire in the center, he put both his feet on the plank closest to the bridge to get by the barrier. He testified "it was kind of a tight squeeze getting in there underneath those boards." Plaintiff stated he crossed on the pipeline because he "had no place to walk on the bridge," and that, although he sometimes went under the bridge, "most of the time I went across the pipe." He had on occasions crossed the bridge roadway when there were no cars. There was no park in the area and the children played around the bridge. Plaintiff testified he always got on the pipeline and beams from the end of the bridge by just walking up and stepping on it.

On the day of the accident, plaintiff was playing near the bridge with three other youngsters, Steve, Bobby and Jay. Plaintiff started to cross along the pipeline structure. He made his way with one leg on each side of the pipe and, in the words of a child witness, "kind of scooting" along. Bobby, who had just stepped onto the pipeline, observed that as plaintiff attempted to go under the barbed wire, his trousers were caught by the wire and as he reached over to extricate himself, he fell about 25 feet to the ground below. Plaintiff suffered severe head injuries.

Several residents of the neighborhood testified that children were wont to play near the bridge and cross it over the pipeline. There was testimony that the bridge and its environs was a favorite meeting place of various children. One witness

thought he recalled that a child was hit by a car on the bridge and killed.

It is not disputed that the bridge and pipeline were essentially in the same condition for many years prior to the accident. As stated in defendant city's brief, "notice of the condition of the bridge maintained by respondent for some 30 years prior to the accident was not an issue." There was no evidence that any complaints had been made with reference to any dangerous condition of the bridge.

Mr. Gilkerson, defendant's city engineer, testified that the bridge in question is the only one in the city upon which no provision has been made for pedestrian crossing. He stated that he had personally seen children on the bridge "quite frequently," but not on the pipeline. After testifying that as early as 1915 defendant and the city of Signal Hill had corresponded on the subject of a new bridge, he remarked: "The pedestrian facilities would no doubt have been discussed in connection with the widening of the vehicular lanes." Asked whether, at the time of the accident, he regarded the bridge as dangerous or defective for pedestrians, he replied: "Only to the extent that it was narrow, and it would be necessary or desirable certainly for pedestrians not to attempt to cross with the vehicles." Also he stated that it would cost just a few hundred dollars to erect a barrier at the approaches to the pipeline structure at each end of the bridge.

James Kincaid testified as director of defendant's public service office, which is responsible for bridge maintenance. His records, available merely from 1951, show that the only expenditure made on the California Avenue bridge was the sum of $11.74 for repair of a railing. He "presumed" that children crossed the bridge to reach two grammar schools in the vicinity.

Robert Dier, the traffic engineer, testified he had discussed with the city engineer the general desirability of having a new bridge at the location here involved and possibly talked about the need for sidewalks. He testified that "any modern bridge would have such a sidewalk" and that the lack of a sidewalk "was one of the reasons I would want a modern bridge at that location." Asked whether the bridge was a hazard to pedestrians, Mr. Dier responded: "I would say it would depend on the pedestrians and the motor vehicles approaching, I would say that it might be safe for a person to cross. It would depend on certain conditions and on the actions of both the pedestrian and the motorist."

At the close of plaintiff's case the trial court granted a motion for nonsuit. Plaintiff appeals from the ensuing judgment.

Plaintiff's counsel makes no attempt to predicate liability through the application of the doctrine of attractive nuisance and asserts he relies entirely on the provisions of the Public Liability Act embodied in section 53051 of the Government Code.*

■ A judgment of nonsuit is proper only if, disregarding any conflict in the evidence and according plaintiff's evidence all the value to which it is legally entitled and indulging every legitimate inference which may be drawn from such evidence, the necessary result is a determination that no substantial evidence exists to support a judgment for plaintiff. (*Aguirre* v. *City of Los Angeles,* 46 Cal.2d 841, 844 [299 P.2d 862].) The only question for consideration is whether the evidence adduced would warrant an inference of tort liability against the city within the scope of the statute. ■ To recover against the city, plaintiff was required to establish a dangerous or defective condition which the city was authorized to remedy, actual or constructive knowledge thereof on the part of the city, an opportunity to take action to protect the public after the acquisition of such knowledge, failure to do so in the responsible officials, and an injury proximately caused by reason of the said condition. (*McNeill* v. *A. Teichert & Son, Inc.,* 137 Cal.App.2d 5, 10 [289 P.2d 595].)

The essence of defendant's argument in support of the judgment of nonsuit is that, as a matter of law, neither the bridge nor the attached pipeline constituted a dangerous or defective condition within the meaning of the statute. It contends, as a corollary to this proposition, that there is not "an iota of evidence pointing to notice to any responsible city official that the pipeline was ever being used as this appellant used it." At the same time, defendant concedes that "there is no dispute that the City knew the condition of the bridge and the condition of the pipeline." ■ The rule is well established that constructive as well as actual knowledge of a

---

*That section reads:

"A local agency is liable for injuries to persons and property resulting from the dangerous or defective condition of public property if the legislative body, board, or person authorized to remedy the condition:

"(a) Had knowledge or notice of the defective or dangerous condition.

"(b) For a reasonable time after acquiring knowledge or receiving notice, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition."

dangerous or defective condition of a street or highway may subject a municipality to liability for damages sustained by reason of such condition. (*Peters* v. *City & County of San Francisco*, 41 Cal.2d 419, 427 [260 P.2d 55] ; *Kirack* v. *City of Eureka*, 69 Cal.App.2d 134, 140 [158 P.2d 270].) ■ As the case last cited points out, it is ordinarily a question for the jury whether the particular circumstances of the case were sufficient to ascribe actual or constructive notice of the condition to the city. ■ There is here present substantial evidentiary basis for a jury finding that defendant knew the pipeline structure was being used as a means of crossing the bridge. This evidence may be epitomized as follows: the bridge was under the city's control for 30 years and its officers knew of its condition; they knew that young children congregated about the bridge; that children had to cross the bridge in going and coming from nearby grammar schools; that the bridge was narrow, and had no pedestrian walks; and that it was dangerous to pedestrians under certain traffic conditions. The pipeline, with its supporting structure and planks, formed a crude passageway situated alongside, and attached to, the bridge. A path demarked in the grass along the side of the bridge led up to the pipeline. Finally, over the middle of the attached pipeline structure there had been erected a barrier consisting of two planks and some strands of barbed wire obviously to block passage beyond this midway point. This concatenation of fact and circumstance could readily suggest to a reasonable mind that the city knew children were crossing on the pipeline and that the only action taken to guard against this practice was to set up a kind of barricade at a halfway point along this route.

We turn now to the question as to whether the manner in which defendant operated and maintained the bridge constituted a dangerous or defective condition. ■ Whether a given set of circumstances creates a dangerous or defective condition of public property is a question normally to be determined by the trier of fact. (*Aguirre* v. *City of Los Angeles, supra.*) In *Hawk* v. *City of Newport Beach,* 46 Cal. 2d 213 [293 P.2d 48], the Supreme Court stated (p. 217) : ''It is the fact a condition involves an unreasonable risk of injury to the public that renders it a dangerous or defective condition within the meaning of the Public Liability Act [citation], and each case must be determined upon its own particular facts [citation].''

528

The bridge upon which this accident occurred was a part of a street or highway under the control of defendant city, and defendant's liability is governed by the requirements stated in the Public Liability Act and the principles developed in the cases construing the statute. (*Bennett* v. *Kings County,* 124 Cal.App. 147, 150 [12 P.2d 47].) It is the duty of a municipality to keep its streets and sidewalks in a reasonably safe condition for travel by the public, using ordinary care to provide against such dangers to the public as may reasonably be anticipated and having due regard to the character of the travel, the incidental purposes for which the highway may be used and the nature of the danger at the point in question. (*McLaughlin* v. *City of Los Angeles,* 60 Cal.App.2d 241, 243 [140 P.2d 416].) The most recent cases have laid down the rule that a municipality may be held liable for failure to guard against accidents due to a dangerous or defective condition even though that condition exists off the traveled portion of the highway so long as it is so connected with or in such proximity to. the traveled portion of the highway as to render it unsafe to those traveling thereon. (*Alderson* v. *County of Santa Clara,* 124 Cal. App.2d 334, 340-341 [268 P.2d 792] ; *Alwood* v. *City of Los Angeles,* 139 Cal.App.2d 49, 57-58 [293 P.2d 69].) Accordingly, the cases last cited point out that a duty rests upon a municipality either to give appropriate warning or to erect and maintain suitable barriers if it has knowledge of the existence of a dangerous condition adjacent to a highway from which risk of injury to pedestrians is reasonably to be foreseen. Furthermore, when a municipality has knowledge that an established public use is being made of government property outside the normal area of invitation under circumstances involving a hazard to the using public, the situation presents a jury question as to whether in fact a dangerous condition of public property existed and whether the city has discharged its duty to ''take action reasonably necessary to protect the public against the condition.'' (*Hawk* v. *City of Newport Beach,* 46 Cal.2d 213, 217 [293 P.2d 48].) Additionally, where children of tender years are exposed to hazard by the manner of operation or maintenance of a municipal facility, the failure of the city to provide a barrier to prevent injury at the point or from the source of danger has been held to constitute a dangerous condition within the statute. (*Bauman* v. *San Francisco,* 42 Cal.App.2d 144, 153 [108 P.2d 989] ; *Huff* v. *Compton City Grammar Sch. Dist.,*

92 Cal.App. 44, 47 [267 P. 918]. See *Gorman* v. *County of Sacramento*, 92 Cal.App. 656 [268 P. 1083]; *Hawk* v. *City of Newport Beach, supra.*)

 When these principles are applied to the particular facts of this case, it surely cannot be held as a matter of law that the bridge and attached pipeline did not constitute a dangerous condition. The bridge in question was taken over by the city and maintained for over 30 years. Since then, although residential and traffic conditions had radically changed and many school children were required to cross and recross the bridge daily, no alteration of the structure had been effected to provide sidewalks or other protected means of passage for child travelers. However, as a part of this bridge and accessible by a well-worn path adjacent to the highway lay an unguarded pipeline situated between flat beams in such fashion as to make a primitive passage. A jury might reasonably find that to the indiscreet or indiscriminate juvenile mind this constituted an implied invitation for use as an alternate route across the bridge, one perhaps even preferable to the highway if traffic was heavy. Certainly the jury might find that the absence of a proper barrier at the bridge approaches to prevent travelers from leaving the highway and using the pipeline as a crossing made the bridge dangerous, especially for youthful pedestrians. Furthermore, the only barrier erected was in the center of the pipeline and consisted of two boards over which some loosely-hung barbed wire was strung. It was this barbed wire along the pathway in which plaintiff became ensnared, and his fall occurred as he attempted to disentangle himself. Whether the presence of barbed wire maintained in a loose condition along a pipeline frequented by children constituted a trap or pitfall for such immature persons and thus constituted a dangerous condition on the bridge was likewise a question which properly should have been submitted to the jury. (*Caston* v. *City of Rock Hill*, 107 S.C. 124 [92 S.E. 191, 193]. See *Marton* v. *Jones*, 44 Cal.App. 299 [186 P. 410].)

The cases primarily relied ·on by defendant are not in point. *Beeson* v. *City of Los Angeles*, 115 Cal.App. 122 [300 P. 993]; *Melendez* v. *City of Los Angeles*, 8 Cal.2d 741 [68 P.2d 971], and *Demmer* v. *City of Eureka*, 78 Cal.App.2d 708 [178 P.2d 472], are cases in which the minor plaintiff departed from the highway and was led by childish whim to explore a body of water in which he drowned. Other cases turn on the fact that at the time plaintiff was injured he was impelled by

motives of childish sportiveness into a situation which the municipality could not reasonably be required to guard against. The case before us is, of course, markedly different and reasonably within the ambit of the municipality's liability for a dangerous condition on a public street being used by a pedestrian.

Since it is our conclusion that the evidence presented substantial questions of fact as to whether a dangerous or defective condition known to the city existed and whether reasonable action had been taken to protect the public from the foreseeable risks of injury, the refusal of the court to submit these matters to the jury constituted reversible error.

The judgment is reversed.

Moore, P. J., and Ashburn, J., concurred.

The petition of respondent City of Long Beach for a hearing by the Supreme Court was denied January 30, 1957.