[Civ. No. 22969.   First Dist., Div. One.   Dec. 8, 1966.]

MAJOR MICHAEL BRANZEL, a Minor, etc., et al., Plaintiffs and Respondents, v. CITY OF CONCORD, Defendant and Appellant.

Schofield & Cunningham, E. R. Cunningham and Richard G. Logan for Defendant and Appellant.

James A. Myers and Russell W. Federspiel for Plaintiffs and Respondents.

SULLIVAN, P. J.—In this wrongful death action, defendant City of Concord (City) appeals from a judgment entered upon a jury verdict in favor of plaintiffs and against City in the sum of $41,000. The same jury returned a verdict in favor of defendant Pacific Gas and Electric Company (PG&E) and against plaintiffs. Plaintiffs have not appealed from the adverse judgment entered on this verdict.

Plaintiffs are the wife and children of decedent Clarence Matthew Branzel. On the afternoon of March 13, 1961 the Branzels—Clarence, Eleanor, his wife, and Major[1] his son, then 16 years old, went to an area maintained by the City for the flying of model airplanes. The purpose of the occasion was to fly a plane recently built by Major, who belonged to a model airplane club called the Concord Model Engineers and had been flying such planes for about two years. Major's plane was of the general type equipped with a motor and flown in a circle by holding and maneuvering a long wire line attached to the plane. The line was about 70 feet long and the plane was capable of 3 to 5 minutes sustained flight at a speed of approximately 60 to 70 miles per hour.

It was stipulated at the trial that the field was located on property owned by the City and for about a year before the accident here involved had been authorized for use by the Model Engineers Club as a flying field. The field was on the north side of Bissel Lane, a City street approximately 21 feet wide. Immediately adjacent to the south side of Bissel Lane, the power lines of defendant PG&E ran in a general easterly

---

[1]Major Branzel was the issue of a prior marriage of Eleanor and had been adopted by decedent after the latter married Eleanor. Plaintiff Cynthia Branzel is the natural daughter of decedent and Eleanor.

and westerly direction. The model planes were controlled from an area in the center of the field which was about 170 feet from the power lines. The field itself was not enclosed and was largely covered with weeds and grass except for a dirt strip 10 feet wide on the perimeter which was used as a take-off and landing area for the planes. Thus this strip was about 70 feet from the center and about 100 feet from the PG&E power lines. A large sign in the southeast corner of the field and close to Bissel Lane identified it as a Model Airplane Field.[2]

The PG&E power lines consisted of three parallel wires suspended 34-35 feet above the ground, on cross-arms attached to poles. The power poles were some 248 feet apart. Each of the three wires carried 2,300-2,400 volts which would pass from any one wire to the ground if contact were made with it. The wires were uninsulated but Irid W. Collins, a consulting electrical engineer and former employee of PG&E, testified that there was no proven reliable insulation in the electrical industry for such wires and that the particular lines were in full conformity with applicable orders of the Public Utilities Commission.

Arriving at the field with his parents, Major, assisted by his father, prepared the model plane for flight by unreeling the control line and getting the engine started. The boy then went to the center of the circle, grabbed the plastic handle at the end of the 70 foot line, and signaled to his father to release the plane. The plane became air-borne and Major started flying it in a circle, counter-clockwise and about 30 or 40 feet from the ground. At this time Major's father was standing on the south side of the flying field and his mother on the west side. After the plane had thus made about a dozen revolutions around the field, the plastic handle at the end of the line slipped from Major's hand[3] and the plane took off uncontrolled in a southerly direction towards Bissel Lane, and the power lines. All three Branzels immediately gave chase, with Mr. Branzel in the lead. It was flying at a speed of about 60 miles per hour and at a height of about 35 feet, with the guideline trailing and the plastic handle at the end at about ground level. At about the north side of Bissel Lane, Mr. Branzel still on the run caught hold of the handle momentarily whereupon the

---

[2]The sign read: ''MODEL AIRPLANE FIELD; Hours 10 am - 7 pm; Absolutely No Flying Models Except During These Hours; Violators Will Be Denied Use of the Field.''

[3]Major testified that when the plane ''came to the south end of the flying field, it banked into the wind and when it left the wind it slacked up and it jerked out of my hand, . . .''

plane appeared "to jerk around," and to climb up and over the wires. The guide wire of the plane went over the high voltage wires and the plane dove and crashed near Major's father. In the process of grabbing to regain the handle or wire, Mr. Branzel caught hold of the plane's guide wire at about the time it came in contact with the power lines and was immediately electrocuted.

The testimony of Major and his mother, together with the evidence as to the speed of the plane and distance travelled, indicates that the accident took place in a period of a few seconds. Decedent was found lying on the ground near the fence enclosing the school district bus depot which was located on the south side of the road and opposite the flying field. When Major and his mother reached the spot, they saw that decedent still had hold of the guide wire and that there were "flickers of fire" and "sparking" coming from his hand.

As the trial court so instructed the jury,[4] plaintiffs' cause of action was based on the Public Liability Act of 1923 (Stats. 1923, ch. 328, p. 675) as set forth in former Government Code section 53051.[5] Said last-mentioned section as in effect at the time of the accident involved in the instant case provided as follows: "A local agency is liable for injuries to persons and property resulting from the dangerous or defective condition of public property if the legislative body, board, or person authorized to remedy the condition: (a) Had knowledge or notice of the defective or dangerous condition. (b) For a reasonable time after acquiring knowledge or receiving notice, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition."

The sole contention made by the City on this appeal is that as a matter of law there was no dangerous or defective condition of any of its property proximately causing decedent's death.

Public property is in a dangerous or defective condi-

---

[4]The trial judge gave instructions substantially in the form of BAJI No. 219-B (Public Liability Act), No. 219-C (what a plaintiff must prove) and No. 219-H (Rev.) (what is a dangerous or defective condition).

[5]The Public Liability Act of 1923 was repealed upon the enactment of the California Tort Claims Act of 1963 (see Stats. 1963, ch. 1681, § 18, p. 3286), said repeal and said latter act becoming effective September 20, 1963. As a result, Government Code section 53051 has been supplanted by new sections dealing with liability of public entities for dangerous conditions of public property. (See Gov. Code §§ 830-840.6; see generally California Government Tort Liability (Cont. Ed. Bar) §§ 2.5; 5.5; 6.3-6.43.)

tion within the meaning of former section 53051 when it involves an unreasonable risk of injury to the public. (*Hawk* v. *City of Newport Beach* (1956) 46 Cal.2d 213, 217 [293 P.2d 48]; *Teall* v. *City of Cudahy* (1963) 60 Cal.2d 431, 433-434 [34 Cal.Rptr. 869, 386 P.2d 493]; *Jones* v. *City of Los Angeles* (1951) 104 Cal.App.2d 212, 215 [231 P.2d 167]; *Gallipo* v. *City of Long Beach* (1956) 146 Cal.App.2d 520, 527 [304 P.2d 106]; *Torkelson* v. *City of Redlands* (1961) 198 Cal.App.2d 354, 358 [17 Cal.Rptr. 899]; *Holder* v. *City of Santa Ana* (1962) 205 Cal.App.2d 194, 197 [22 Cal.Rptr. 707]; *Campbell* v. *City of Palm Springs* (1963) 218 Cal.App.2d 12, 21 [32 Cal.Rptr. 164].) To put it another way, the condition of the property is dangerous or defective ''if the hazard is one from which injury may reasonably be anticipated to those properly using the area for the purpose intended.'' (*Gentekos* v. *City & County of San Francisco* (1958) 163 Cal.App.2d 691, 696 [329 P.2d 943]; *Jones* v. *City of Los Angeles, supra.*) As stated in *Jones*: ''Since the city is not an insurer of the safety of its property [citation], the degree of hazard created by a given condition of property is determinative as to whether it is a dangerous or defective condition within the purview of the statute.'' (104 Cal.App.2d at p. 215; *Holder* v. *City of Santa Ana, supra.*)

█ In determining whether public property is in a dangerous or defective condition, one of the pertinent factors to be considered is the use to which the property is put. (*Torkelson* v. *City of Redlands, supra,* 198 Cal.App.2d 354, 358.) As we said in *Bauman* v. *City & County of San Francisco* (1940) 42 Cal.App.2d 144, 153 [108 P.2d 989], ''a dangerous or defective condition can be created by the use or general plan of operation of government operated property, as well as by a structural defect. [Citation.]'' (See *Holder* v. *City of Santa Ana, supra,* 205 Cal.App.2d 194, 198 and cases there collected.) It has been said therefore that ''the use factor to be considered in making such determination includes not only its designed or originally intended use, but every other reasonably anticipated use. . . .'' (*Torkelson* v. *City of Redlands, supra,* at p. 361.) In sum, whether the risk is unreasonable depends in a sense on whether the injury may be reasonably anticipated from an ordinary use of the property. (*Holder* v. *City of Santa Ana, supra.*)[6]

---

[6]Of interest and assistance here are pertinent sections of the Tort Claims Act of 1963 and pertinent Law Revision Commission Comment.

■ Whether a given set of facts or circumstances creates a dangerous or defective condition is as a general rule a question of fact for the determination of the trier of fact (*Aguirre* v. *City of Los Angeles* (1956) 46 Cal.2d 841, 844 [299 P.2d 862]; *Bauman* v. *City & County of San Francisco, supra,* 42 Cal. App.2d 144, 153; *Ziegler* v. *Santa Cruz City High School Dist.* (1959) 168 Cal.App.2d 277, 281 [335 P.2d 709]; *Torkelson* v. *City of Redlands, supra,* 198 Cal.App.2d 354, 358; *Holder* v. *City of Santa Ana, supra,* 205 Cal.App.2d 194, 197) but the question may be determined as a matter of law "if reasonable men following the law can draw but one conclusion from the evidence presented." (*Gray* v. *Brinkerhoff* (1953) 41 Cal.2d 180, 183 [258 P.2d 834]; *Beck* v. *Kessler* (1965) 235 Cal.App. 2d 331, 335-336 [45 Cal.Rptr. 237] and cases there cited; *Holder* v. *City of Santa Ana, supra,* at pp. 197-198.)

■ Applying the foregoing principles to the facts of the instant case, we cannot conclude that as a matter of law defendant City's flying field for model airplanes did not constitute a dangerous or defective condition of public property. It is beyond dispute that the City established the field on its own property immediately across from and in close proximity to the high voltage power lines of defendant PG&E; that the field was made available, maintained and duly authorized for the flying of model airplanes; and that on the occasion

---

The sections in point indicate no material changes in the law applicable to the facts now before us.

Government Code section 835 provides: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either: (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

Government Code section 830, subdivision (a) provides: " 'Dangerous condition' means a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used."

Law Revision Commission Comment in respect to section 830 states in part: "Under the definition as it is used . . . , a public entity cannot be held liable for dangerous conditions of 'adjacent property.' A public entity may be liable only for dangerous conditions of its own property. *But its own property may be considered dangerous if . . . a condition on the adjacent property exposes those using the public property to a substantial risk of injury.*" (Italics added.)

in question the Branzel family were properly and lawfully using it for the purpose for which it was intended. Such use of the field contemplated the flying of the airplanes in a wide circle, at extremely high speeds and at some distance off the ground, controlled only by a slender wire held by a person in the center of the area of flight. It is obvious that the activity calls for care, skill and alertness on the part of the single human participant who must not only act as a pivot for the plane throughout its rapid arc of 360° but also guide and maneuver it against all the air currents and other vicissitudes of its flight. Thus a miniature machine of high but unregulated velocity, precarious and unpredictable conditions of flight and the ingredient of human skill, often as here compressed in the grasp of a young hand, are all variables in the equation of a successful flight.

It is not unreasonable to anticipate that a momentary miscalculation or lapse on the part of the human agent, some quirk in his instinctive reaction to the behavior of the plane or, as the evidence shows here, some sudden and unforeseen incident of the flight, will wrest the plane from the control of the flier and send it off erratically to an area outside the circle. Major Branzel testified that while he had never had a plane escape from him before, he had seen them get away from others on more than one occasion. Though relatively small, at its high speed it is certainly a dangerous missile to both persons and property. It is also not unreasonable to anticipate that the persons flying the plane, and perhaps even others, will instinctively do everything possible to retrieve it and in such event would attempt to grab the only available part of the apparatus (the airplane itself being too high) which would be the trailing wire. Thus one can reasonably anticipate that a plane could break away in a southerly direction and at its normal altitude could almost instantly come in contact or become entangled with the high voltage wires with the control wire of the plane trailing in ample length to be instantly grasped by the pursuers and to be the instantaneous conduit of death.

The foregoing conclusions are buttressed by the facts before us, significant among which is the time-distance factor involved. The evidence indicates that when Major lost control of the plane it probably had less than 200 feet to fly[7] before

---

[7] As previously stated, the distance from the center of the flying circle to the high voltage wires was approximately 170 feet. Since the radius of the circle as measured by the guide-line of the plane was approximately 70 feet, the distance from the southerly edge of the circle to the

coming up to the power wires and that it was airborne at about 30-40 feet off the ground at a speed of 60 miles per hour. Without essaying precise mathematical calculation, we think it is fairly accurate to say that the plane travelling at a speed of about 88 feet per second would have reached the danger point in less than three seconds. No obstacle stood between the plane and the wire; no fence or other enclosure impeded the pursuers; no sign or warning gave them pause. Under these conditions and in this instant of time occurred flight, pursuit and death.

In any event we think there was room for a reasonable difference of opinion as to whether under all of the circumstances it should have been foreseen that planes would get out of control and come in contact with the power wires and that persons attempting to regain control of them would be exposed to electrocution through the control wires trailing from the planes. The dangerous and deadly nature of high voltage electricity is a matter of common knowledge. While the City did not maintain or control the power lines, it did maintain the flying field in a location so close to them that in the light of the known use of the field the involvement of the field with the lines could be reasonably anticipated. It seems to us that the establishment and maintenance of the field can be properly evaluated ''by the hazard inherent in highly charged wires'' (*Austin* v. *Riverside Portland Cement Co.* (1955) 44 Cal.2d 225, 232 [282 P.2d 69]) and that the condition of the field can be considered dangerous because the condition of the adjacent power lines exposed those using the field to a substantial risk of injury. We conclude that from all the facts the jury was justified in finding, as it impliedly did, that the field constituted a dangerous or defective condition proximately causing decedent's death.

*Demmer* v. *City of Eureka* (1947) 78 Cal.App.2d 708 [178 P.2d 472]; *Howard* v. *City of Fresno* (1937) 22 Cal.App.2d 41 [70 P.2d 502] and *Beyer* v. *City of Los Angeles* (1964) 229 Cal.App.2d 378 [40 Cal.Rptr. 341], relied on by defendant City, are clearly distinguishable. In *Demmer* plaintiff's son left a city street and amused himself by paddling on a log

wires was approximately 100 feet. Although the record is silent as to the precise location of the plane when Major lost control of it, we can properly assume that it was not at the extreme southerly point of the circle but was most probably somewhere around the midpoint of the westerly semi-circle, thus permitting flight on a southerly tangent directly to the lines. It is a fair approximation to say that the plane was slightly less than 200 feet from the wires at this point.

around an adjacent pond created by the construction of the street and extending over part of the street embankment. He fell off the log and was drowned. Judgment of dismissal entered on the sustaining of a demurrer was affirmed. In *Howard* small children left the playground area in the city's park and proceeded to the trash-burning area remotely located some distance away where they were burned while playing on a pile of ashes. Judgment for the plaintiffs was reversed. In the foregoing cases it was not reasonably to be expected that the embankment and pond and the trash-burning area would be used as a playground. In *Beyer* plaintiff drove her car onto the unpaved shoulder of a road in order to stop and talk to a friend. In so doing her car struck a water valve, hidden by weeds, and actually located off the shoulder and on private property. Judgment of nonsuit was affirmed. The plaintiff was not using the street in any sense of the word at the time of the accident and the valve was not a menace to the use of the street or the shoulder. The case is therefore unlike the instant one where the power wires presented a reasonably foreseeable risk of injury to the use of the flying field.

The judgment is affirmed.

Molinari, J., and Sims, J., concurred.