[No. B154365. Second Dist., Div. Six. July 8, 2003.]

JENNIFER JOYCE, Plaintiff and Respondent, v.
SIMI VALLEY UNIFIED SCHOOL DISTRICT, Defendant and Appellant.

## COUNSEL

Benton, Orr, Duval & Buckingham, Bruce Alan Finck and Susan B. Gans-Smith for Defendant and Appellant.

Cumberland, Coates & Duenow and Greg A. Coates for California School Board Association as Amicus Curiae on behalf of Defendant and Appellant.

Law Offices of Gary A. Dordick and Gary A. Dordick for Plaintiff and Respondent.

## OPINION

**YEGAN, J.**—In this, the fourth appeal arising from a serious personal injury action, Simi Valley Unified School District (District) appeals from a $2,887,022.90 judgment entered against it after the jury found that an open school yard gate, constructed next to a dangerous intersection, constituted a dangerous condition of public property. (Gov. Code, §§ 830, subd. (a), 835.) District launches a plethora of unsuccessful claims. We affirm and hopefully put an end to this litigation.

### FACTS AND PROCEDURAL HISTORY

On May 11, 1989, then 13-year-old Jennifer Joyce was struck in a marked crosswalk at Medina and Sequoia Avenues in the City of Simi Valley. Jennifer was on her way to Sequoia Junior High School. The crosswalk had no signals and crossed a busy four-lane street. It allowed children access to the adjacent school through an open school yard gate.

A motorist, Karen Smith, struck Jennifer in the No. one southbound lane of Sequoia Avenue. Jennifer was thrown 40 feet, resulting in severe head injuries.

After the motorist settled for $50,000, Jennifer sued District and the City of Simi Valley (City). The first amended complaint alleged that prior accidents and "near misses" had occurred at the subject crosswalk, that the open

school yard gate encouraged students to use the crosswalk, and that District failed to warn about the dangerous intersection or direct students to use the signaled crosswalk near the front of the school.

*First Appeal: The Demurrer*

District demurred on the ground that the open gate was not a dangerous condition of public property within the meaning of Government Code section 835. The trial court sustained the demurrer without leave to amend. We held that the open school yard gate could be a dangerous condition if it encouraged students to cross a dangerous intersection next to the school (*Joyce v. Simi Valley Unified School Dist,* (Aug. 18, 1992, B053453), opn. ordered nonpub. Nov. 12, 1992, S028891.)

*First Trial: Jury Instruction Error*

In the first trial, the trial court instructed that District was not liable unless the crosswalk, which was owned and maintained by City, had a physical defect. The jury found for City and District. We affirmed as to City. We reversed as to District on instructional error because District's duty of care did not rise or fall on whether the crosswalk had a physical defect.

*Second Trial: Attorney Misconduct*

The jury in the second trial found District at fault and awarded $2.75 million damages, resulting in a $1.947 million judgment against District. District was granted a new trial on the ground of attorney misconduct. We affirmed in an unpublished opinion. (*Joyce v. Simi Valley Unified School Dist.* (Dec. 15, 1998, B115491).)

*Third Trial*

At the third trial, the school principal, Franklin Finch, testified that he ordered a hole cut in the fence shortly after the school opened in 1970. The fence opening was built next to the crosswalk to encourage students to cross at the Medina-Sequoia intersection. Finch did not consult an architect, engineer, or traffic safety expert before cutting the hole.

Harry Krueper, Jr., a traffic engineer, testified: "The opening in the fence … was a focal point or funnel point … for school children … to gain access to the school.… [I]t concentrated the pedestrian flow into one area where you were crossing a wide roadway [Sequoia Avenue], a 64-foot wide, roadway that had, I would call, moderate to high speeds." Because the T-shaped intersection restricted the line of sight of motorists, it had the

potential of hiding pedestrians using the crosswalk. As the area grew, Sequoia Avenue became a secondary highway with a traffic volume of more than 15,000 vehicles per day. Less than 3 percent of the motorists observed the posted speed limit. District's expert, Weston Pringle, agreed that speeders "would cause [an] unreasonable risk of harm for the kids."

Before Jennifer was struck in the crosswalk, parents and District employees complained about the intersection. Joy Azzinaro, a school playground aide, heard screeching brakes and saw near misses almost every day. She notified school officials but no corrective action was taken.

Joyce Smith, a school bus driver, saw motorists speed through the intersection and complained about near-miss accidents. Smith testified that the crosswalk was hard to see because it was "right after the top of the crest, right on top of it. So you don't actually see the striping where the actual crosswalk is."

Several months before Jennifer was injured, City conducted a traffic study and determined that 85 percent of the motorists drove 49 miles per hour on Sequoia Avenue. The posted speed limit was 35 miles per hour when children were not present and 25 miles per hour when children were present. (Veh. Code, § 22352, subd. (a)(2)(B).) City raised the speed limit to 40 miles per hour when children were not present.

Carol Joy, president of the Sequoia Junior High School Booster Club, was concerned about the speed increase and conducted meetings on the perceived traffic hazard. Finch and other school officials attended the meetings. A traffic safety expert from the police department spoke at one of the meetings and recommended that students cross at the Cochran-Sequoia signal near the front of the school.

Finch was concerned about speeders and appeared before the city council six or eight times. More than 1,200 students entered and left the school each day. When Finch learned about the proposed speed increase, City told him to direct the students to cross up the street at the traffic light.

Finch claimed that his "responsibility 'ended' at the fence lines" and that "I d[o] not take my direction from the city council." He told the Booster Club that he was not closing the school yard gate. Finch did not discuss the matter with his superiors because "[w]e were not even considering closing it, so why would we discuss it?" Although District stationed personnel at the front of the school to supervise students coming to and leaving school, Finch did not request a monitor for the Medina-Sequoia crosswalk.

The jury, by special verdict, found that the open school yard gate was a dangerous condition and that District did not take reasonable action to protect

against the risk of injury. (Gov. Code, §§ 835, 835.4, subd. (a).) The jury apportioned 10 percent liability to District, 3 percent liability to Jennifer, 75 percent liability to the driver (Karen Smith), and 12 percent liability to City. Jennifer was awarded $2,610,848.45 economic damages and $3,750,000 noneconomic damages.

District unsuccessfully moved for new trial and judgment notwithstanding the verdict. The trial court modified the judgment to reflect the $50,000 settlement with the driver (Code Civ. Proc., § 877) and denied a motion to deduct collateral source payments. (Gov. Code, § 985.) A net judgment in the amount of $2,887,022.90 plus costs was entered against District.

### Dangerous Condition of Public Property

District contends that the open school yard gate was not a dangerous condition of public property. The argument is based on the theory that District has immunity as a matter of law because the injury occurred off school property.

Government Code section 830, subdivision (a) provides that a "dangerous condition" is "a condition of property that creates a substantial ... risk of injury when such property *or adjacent property* is used with due care in a manner in which it is reasonably foreseeable that it will be used." (Italics added.)[1] The California Law Revision Commission comments to section 830 state: "A public entity may be liable only for dangerous conditions of its own property. But its own property may be considered dangerous if it creates a substantial risk of injury to ... persons on adjacent property; and its own property may be considered dangerous if a condition on the adjacent property exposes those using the public property to a substantial risk of injury." (Cal. Law Revision Com. com., 32 West's Ann. Gov. Code (1995 ed.) foll. § 830, p. 299.)

■ Pursuant to sections 830 and 835, a public entity may have a duty to protect against a risk of harm on adjacent property.[2] (E.g., *Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 841 [206 Cal.Rptr. 136, 686 P.2d 656] [sign next to intersection obstructed view].) For example, in *Branzel v. City of Concord* (1966) 247 Cal.App.2d 68, 75 [55 Cal.Rptr. 167], a city model plane field was found to be a dangerous condition of public

---

[1] Unless otherwise indicated, all statutory references are to the Government Code.

[2] Section 835 states in pertinent part that "a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, [and] that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred ...."

property because nearby electrical lines exposed those using the field to a substantial risk of injury. "While the City did not maintain or control the power lines, it did maintain the flying field in a location so close to them that in the light of the known use of the field the involvement of the field with the lines could be reasonably anticipated." (*Ibid.*)

In the first appeal, we said that "[t]here is a difference between failing to take action to influence or affect a danger and encouraging students to expose themselves to a danger." ( *Joyce, supra,* B053453.) Although District did not control the crosswalk, it did control whether an opening in the fence should be made. The open gate was built next to the crosswalk to encourage students to cross at an uncontrolled intersection.[3] It diverted children from a safer, signal-controlled intersection less than 500 feet away. We concluded that a reasonable trier of fact could find that the open gate was a dangerous condition that could have been remedied by simply closing the fence opening and directing students to cross at the signal. (E.g., *Warden v. City of Los Angeles* (1975) 13 Cal.3d 297, 300 [118 Cal.Rptr. 487, 530 P.2d 175] [dangerous condition may result from location alone—a submerged sewer pipe].) The cases cited by District are not here controlling. They do not involve schools encouraging children to cross a dangerous intersection. (E.g., *Lompoc Unified School District v. Superior Court* (1993) 20 Cal.App.4th 1688, 1697 [26 Cal.Rptr.2d 122] [bicyclist hit by motorist who was distracted by school football game; no dangerous condition of public property]; *Seaber v. Hotel Del Coronado* (1991) 1 Cal.App.4th 481, 493 [2 Cal.Rptr.2d 405] [no duty to warn of dangerous crosswalk outside hotel]; *Owens v. Kings Supermarket* (1988) 198 Cal.App.3d 379, 387–388 [243 Cal.Rptr. 627] [no liability where customer hit in street in front of supermarket].)

Jennifer's case is similar to *Bonanno v. Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139 [132 Cal.Rptr.2d 341, 65 P.3d 807]. There, our Supreme Court held that a bus stop, owned and maintained by Central Contra Costa Transit Authority (CCCTA), was a dangerous condition of public property. After residents complained that they were having difficulty crossing an intersection to get to and from the bus stop, county painted a crosswalk. Plaintiff, a bus patron, used the crosswalk to get to the bus stop. A motorist stopped to let plaintiff cross and was struck from behind, causing her vehicle to lurch forward and hit plaintiff.

Citing *Warden v. City of Los Angeles, supra,* 13 Cal.3d 297 and *Branzel v. City of Concord, supra,* 247 Cal.App.2d 68, our Supreme Court stated: "That the location of a public improvement or, more broadly, its relationship to its

---

[3] Finch claimed that he cut the hole in the chain link fence because students were climbing the fence and injuring themselves. He was impeached by the school nurse, Carol Ann Barton, who testified that there were no reported injuries.

surroundings, may create dangers to users is by no means a novel idea." (*Bonanno v. Central Contra Costa Transit Authority, supra,* 30 Cal.4th at p. 149.) The court rejected the argument that CCCTA "cannot be liable for an injury occurring on property (the street) it neither owned nor controlled. CCCTA owned and controlled its own bus stop, and a condition of *that* property, its physical situation, caused users of the bus stop to be at risk from the immediately adjacent property, just as the model airplane flyers were at risk from the adjacent power lines in *Branzel, supra,* 247 Cal.App.2d 68 .... [¶] Nor is it determinative that Bonanno's injury occurred on adjacent County property as she approached the bus stop, rather than while she was awaiting the bus at the stop itself.... [T]hat Bonanno was injured trying to access CCCTA's property makes her no less a user of it. If a CCCTA bus stop could be reached only by jumping across an adjacent ditch, CCCTA would logically bear the same liability to a patron who fell into the ditch attempting to reach the [bus] stop as to one who fell while waiting at the [bus] stop." (*Id.,* at p. 151.)

■ Here liability is based on District's failure to provide adequate safeguards against a known dangerous condition. (E.g., *Ducey v. Argo Sales Co.* (1979) 25 Cal.3d 707, 717 [159 Cal.Rptr. 835, 602 P.2d 755].) ■ "It is not only structural defects that can create a dangerous condition; it may consist of a condition of property, the use of which in a manner reasonably foreseeable creates a danger of injury." (*Quelvog v. City of Long Beach* (1970) 6 Cal.App.3d 584, 590 [86 Cal.Rptr. 127] [dangerous condition because city encouraged use of "autoettes" on sidewalk].) In *Constantinescu v. Conejo Valley Unified School Dist.* (1993) 16 Cal.App.4th 1466, 1474 [20 Cal.Rptr.2d 734], we held that schools "may be held liable for failure to erect barriers or to correct other conditions on their property."

The same principle applies here. District was aware of the dangerous intersection but insisted on keeping the gate open after City increased the speed limit. Substantial evidence supported the finding that the open gate was a dangerous condition of public property and that District failed to take reasonable action to protect against a foreseeable and substantial risk of injury. (§§ 835, subds. (a)-(b), 835.4.) District officials could " 'not complacently declare that they were powerless over a long period of years to take any steps to remedy [the] dangerous condition' ...." (*Warden v. City of Los Angeles, supra,* 13 Cal.3d at p. 301.)

## Education Code Section 44808

Citing Education Code section 44808, District argues that it had no duty to supervise students going to and from school.[4] Liability, however, was not based on lack of school supervision but an open gate that enticed children to cross an adjacent dangerous intersection. In the first appeal this court held that Education Code section 44808 did not provide immunity. ( *Joyce, supra,* B053453.) "Although the initial portion of the statute provides that 'no school district shall be responsible ... for the conduct or safety of any pupil ... at any time when such pupil is not on school property,' the section goes on explicitly to withdraw this grant of immunity whenever the school district, inter alia, '*has failed to exercise reasonable care under the circumstances.*' " (*Hoyem v. Manhattan Beach City Sch. Dist.* (1978) 22 Cal.3d 508, 517 [150 Cal.Rptr. 1, 585 P.2d 851].)

## Jury Instructions

District contends that the trial court erred in not instructing on several statutory immunities governing traffic signs and signals (BAJI Nos. 11.59 and 11.60). The trial court found that the instructions would confuse and mislead the jury.[5] It did not err. Jennifer did not claim that District breached a duty to install traffic signs and signals or modify the crosswalk.

District argues that the jury should have been instructed that it had no duty to supervise students going to and from school. (Special instruction Nos. 9,

---

[4] Education Code section 44808 states in pertinent part: "No school district ... shall be responsible or in any manner liable for the conduct or safety of any pupil of the public schools at any time when such pupil is not on school property, unless such district ... has undertaken to provide transportation for such pupil to and from the school premises, has undertaken a school-sponsored activity off the premises of such school, has otherwise specifically assumed such responsibility or liability *or has failed to exercise reasonable care under the circumstances.*" (Italics added.)

[5] The trial court stated: "I'm not inclined to give this at all. First of all, we're not talking about dangerous conditions that might be applicable to the city or the crosswalk per se. And I don't think there is any issue here concerning the inability of the School District to provide official regulatory traffic signs or traffic signals or control the crosswalk. I don't think there is any dispute in this case at all concerning the physical limitations. And if there needs to be an instruction on that, which I don't think—I mean, the evidence is uncontroverted in that regard. [¶] So if plaintiff begins to suggest somehow in its argument that the School District could have painted a different crosswalk or put up a red light, then maybe some more appropriate instruction in the middle of argument would be appropriate, but I don't see the plaintiff doing that. [¶] .... [¶] So 11.59 is going to be refused. This will confuse the jury, and it's not really applicable to the issues. [¶] Similarly 11.60. It confuses the issues between perhaps the public entity [i.e., District] and the city."

10, 11, 13 and 14.)[6] ■ The trial court, however, was not required to give argumentative and conflicting instructions. (E.g., *Fibreboard Paper Products Corp. v. East Bay Union* (1964) 227 Cal.App.2d 675, 718 [39 Cal.Rptr. 64].) The trial court found that special instruction No. 9 was overbroad and that special instruction No. 10 "could lend itself to confusion and conflict between the instructions I'll be giving the jury on the liability of a public entity for dangerous condition .... [¶] For example, the opening phrase informs the jury that there is no responsibility in any way for the safety of a pupil when the pupil is not on school property. Well, that seems to at least conflict in a common sense way with the whole hypothesis of a dangerous condition here where children are crossing a crosswalk, getting hit by a car .... [T]hat's part of a dangerous condition of school property."

Special instruction No. 13 paraphrased Vehicle Code section 21368 and described how a school crosswalk should be painted. Special instruction No. 14 paraphrased Vehicle Code section 21372 concerning traffic control devices. The trial court declined to give the instructions because it was undisputed that District had no duty to maintain the crosswalk or install traffic control devices. The court was not required to instruct on untenable theories or unpled defenses. (*Cain v. State Farm Mut. Auto. Ins. Co.* (1975) 47 Cal.App.3d 783, 797 [121 Cal.Rptr. 200]; *Harris v. Oaks Shopping Center* (1999) 70 Cal.App.4th 206, 209 [82 Cal.Rptr.2d 523] ["Irrelevant, confusing, incomplete or misleading instructions need not be given."].)

Special instructions Nos. 16 and 17 stated that the jury was not to consider whether Jennifer was provided adequate educational instruction. The trial court ruled that the proposed instructions were ambiguous and not supported by the evidence or theories advanced at trial. There was no instructional error. The duty to safeguard against a dangerous condition is not part of a school's discretionary immunity in selecting an academic curriculum. (See *Peter W. v. San Francisco Unified Sch. Dist.* (1976) 60 Cal.App.3d 814, 825 [131 Cal.Rptr. 854]; *Searcy v. Hemet Unified School Dist.* (1986) 177 Cal.App.3d 792, 805 [223 Cal.Rptr. 206] [student struck half-mile from school; no duty to educate on how and where to cross streets].)

District argues that the trial court should have instructed that the crosswalk was found not to be a dangerous condition in the second trial. (Special

---

[6] Special instruction No. 9 stated that District had no duty to supervise students before they arrived at school. Special instruction No. 10 stated that District was not responsible for the safety of a student when the student was not on school property. Special instruction No. 11 stated that the Education Code does not impose a statutory obligation on school districts to supply traffic protection to pupils.

instructions Nos. 3 and 4.)[7] The trial court declined to give the proposed instructions because "[t]hey're going to be dealing in terms of unreasonable risks from a totality of circumstances as opposed to ... a dangerous condition of a particular crosswalk .... [W]hether the crosswalk is a dangerous condition as that technical term might be defined is really irrelevant. That's been decided previously at a prior trial. [¶] As to whether ... the use of the crosswalk in ordinary care by people presents unreasonable risks of injury is a different consideration ... and I don't want to confuse them."

There was no instructional error. The jury was asked to determine the comparative fault of District, City, Jennifer, and the driver. It found City 12 percent at fault. District's proposed instructions conflicted with the special verdict form and would have required the jury to find that the crosswalk was not dangerous. (E.g., *Byrum v. Brand* (1990) 219 Cal.App.3d 926, 938–939 [268 Cal.Rptr. 609] [special verdict form may not conflict with instructions].)

District requested other instructions that were argumentative and confusing. (Special instruction Nos. 18, 19, and 20 [District's right to access public street and sidewalk].) Rejecting the instructions, the trial court stated: "The question is whether ... [District] allowed a use of [its] property to become a dangerous use by reason of some of the hazards and risk[s] on the adjacent property, not whether the District has a right of access to the sidewalk. This is not a real property case."

We agree. The instructions proposed by District would have diverted the jurors from the real issues before them. ■ An instruction correct in the abstract, may not be given where it is not supported by the evidence or is likely to mislead the jury. (*Solgaard v. Guy F. Atkinson Co.* (1971) 6 Cal.3d 361, 370 [99 Cal.Rptr. 29, 491 P.2d 821].)

LAW OF THE CASE

District contends that the trial court erred in instructing that "[s]chool property (i.e. a fence opening), that is otherwise non-hazardous, may constitute a dangerous condition if it exposes the users of nearby public property (i.e. the crosswalk) to a substantial risk of injury." The instruction was taken from our unpublished opinion in the second appeal in which we said that the

---

[7] Special instruction No. 3 stated: "The issue of whether the cross-walk adjacent to the opening in the schoolyard fence was in a dangerous condition as alleged by plaintiff, Jennifer Joyce, was resolved against the plaintiff in a prior trial, and was the subject matter of a prior trial, as well as a prior appellate decision. [¶] It is now the law of the case."

Special instruction No. 4 stated: "As a result of a prior trial and appellate decision, *you must find that the crosswalk adjacent to the opening in the schoolyard fence was not a dangerous condition.*" (Italics added.)

"fence opening theoretically created a dangerous condition because it encouraged school children to cross at the uncontrolled intersection." (*Joyce, supra,* B085863.) We explained that a dangerous condition of public property includes property which, because of its general use and operation, creates a substantial risk of harm to foreseeable users. (*Rodriguez v. Inglewood Unified School Dist.* (1986) 186 Cal.App.3d 707, 717 [230 Cal.Rptr. 823].)

The doctrine of law of the case bars District from challenging the instruction in this appeal. (E.g., *Clemente v. State of California* (1985) 40 Cal.3d 202, 210–213 [219 Cal.Rptr. 445, 707 P.2d 818] [appeal from judgment on demurrer, law of the case]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 906, pp. 941–942.) ■ The doctrine of the law of the case provides that " ' "the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent trial or appeal in the same case." (Citations.)' " (*Yu v. Signet Bank* (2002) 103 Cal.App.4th 298, 309 [126 Cal.Rptr.2d 516].) Although appellant argues to the contrary, there was no material change in the evidence, requiring a different instruction. (*Wells v. Lloyd* (1942) 21 Cal.2d 452, 456–457 [132 P.2d 471] [law of case doctrine applies where issues and facts on retrial are substantially the same]; *Weightman v. Hadley* (1956) 138 Cal.App.2d 831, 841 [292 P.2d 909] [same].) "Litigants are not free to continually reinvent their position on legal issues that have been resolved against them by an appellate court." (*Yu v. Signet Bank/Virginia* (2002) 103 Cal.App.4th 298, 312 [126 Cal.Rptr.2d 516].)

BAJI No. 3.38

In the second appeal, we held that it was error not to give BAJI No. 3.38 on the standard of care in dealing with children. District argues that the instruction, which was given in the third trial, erroneously implied that it had a duty to supervise students in the street.[8]

The jury was correctly instructed. (E.g., *Calandri v. Ione Unified School Dist.* (1963) 219 Cal.App.2d 542, 550, 33 Cal.Rptr. 333 [error not to instruct on standard of care owed by adult to child].) Because of the special relationship between District and its students, District had a "heightened duty to make the school safe …. [Citation.] [¶] The California Law Revision

---

[8] The BAJI No. 3.38 instruction stated: "Ordinarily it is necessary to exercise greater caution for the protection and safety of a young child than for an adult person who possesses normal physical and mental faculties. One dealing with children must anticipate their ordinary behavior. The fact that children usually do not exercise the same degree of prudence for their safety as adults, or that they often are thoughtless and impulsive, imposes a duty to exercise a proportional vigilance and caution on those dealing with children, and from whose conduct injury to a child might result."

Committee notes that '[w]here it is reasonably foreseeable that persons to whom a lower standard of care is applicable—such as children—may be exposed to a substantial risk of injury from the property, the public entity should be required to take reasonable precautions to protect such persons from that risk.' " (*Constantinescu v. Conejo Valley Unified School Dist., supra*, 16 Cal.App.4th at p. 1473.)

District defended on the theory that Jennifer and the motorist were negligent. ■ But concurrent negligence does not defeat its own maintenance of a dangerous condition or the standard of care owed. (E.g., *Bonanno v. Central Contra Costa Transit Authority, supra*, 30 Cal.4th at p. 151 [transit authority liable for maintaining bus stop next to dangerous intersection; motorist 88 percent at fault]; *Baldwin v. State of California* (1972) 6 Cal.3d 424, 428, fn. 3 [99 Cal.Rptr. 145, 491 P.2d 1121] [driver's negligence did not defeat claim for dangerous condition of public property]; *Alexander v. State of California ex rel Dept. of Transportation* (1984) 159 Cal.App.3d 890, 902 [205 Cal.Rptr. 758] [same].) The trial court correctly noted that "students approaching the school, crossing the intersection appropriately and with due care, and also entering in through the gate were confronted with significant risks of injury, and that would qualify as a dangerous condition .... And the question then might be whether the School District took the appropriate action or not. Were they reasonable in the way they behaved? These are all jury questions ...."

Construed as a whole, the instructions adequately instructed on the theory of the case and applicable defenses. There is no merit to the argument that the alleged instructional errors, either singly or cumulatively, resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298].

### Motion for New Trial

In the first phase of trial on liability, the jury was bussed to the school to view the intersection and fence opening. During the visit, a truck approached the crosswalk and failed to yield until the bailiff gestured to the driver. Jennifer's attorney remarked about the incident in final argument. The trial court sustained an objection and directed the jury to ignore counsel's remarks.[9] The jury was instructed that the statements of counsel were not

---

[9] Jennifer's counsel stated: "We went in a caravan in this crosswalk ... with his Honor pulling up the rear—granted there is a certain judicial look, but without the robe you may not know it's a judge there. But our bailiff has a gun, a badge, a uniform—can't miss that. He's leading the parade and darn near got killed. Darn near got run over in the crosswalk. With 16 of us there—

"MR. FINCK [Counsel for District]: Objection; assumes facts not in evidence.

evidence (BAJI No. 1.02) and to "decide all questions of fact in this case from the evidence received in this trial and not from any other source." (BAJI No. 1.00.5.)

Having reviewed the entire record, we conclude that the admonishment cured any prejudice. (E.g., *Clemente v. State of California* (1985) 40 Cal.3d 202, 217 [219 Cal.Rptr. 445, 707 P.2d 818].) The motion for new trial was properly denied. "A trial judge is in a better position than an appellate court to determine whether a verdict resulted wholly, or in part, from the asserted misconduct of counsel and his conclusion in the matter will not be disturbed unless, under all the circumstances, it is plainly wrong. [Citations.]" (*Cope v. Davison* (1947) 30 Cal.2d 193, 203 [180 P.2d 873].)

## JUROR MISCONDUCT

In the second phase of trial on damages, a juror submitted a note that stated: "A few members of the jury and I would like to know if the percentage given to the school district of Simi Valley, in question # 7 of the special verdict [on liability], should influence our decision on the award amount given to the Plaintiff[?]" The trial court instructed that the prior findings on comparative fault had no bearing on damages. The jurors were admonished not to talk about the case until it was submitted to them.

District argues that the admonition was "too little and too late" and complains that the jury was not admonished each time it recessed. (Code Civ. Proc., § 611.) In the first phase of trial on liability, the jurors were instructed 14 times not to discuss the case or form opinions before the case was submitted to them. In the second phase of trial on damages, the jury was admonished only once. District did not object. "[*B*]*oth* an objection and proof of prejudice are required before a failure to readmonish [is] deemed reversible error." (*People v. Morales* (1989) 48 Cal.3d 527, 565 [257 Cal.Rptr. 64, 770 P.2d 244].)

The trial court did not err in denying the motion for new trial. (E.g., *City of Pleasant Hill v. First Baptist Church* (1969) 1 Cal.App.3d 384, 430 [82

"THE COURT: I don't know what Counsel is referring to so it's sustained.
"MR. DORDICK [Counsel for Jennifer]: Passing across the street there was a car that those of us certainly towards the front next to our protector, the sheriff, didn't yield—did not yield at all.
"MR. FINCK: This isn't in the evidence, your Honor.
"THE COURT: Sustained. It's not a part of the evidence. The jury view was for other purposes. [¶] ... [A]void arguing traffic conditions."

Cal.Rptr. 1] [trifling juror misconduct not grounds for new trial].)[10] But for the alleged error, it is not reasonably probable that District would have received a more favorable verdict. (Cal. Const., art. VI, § 13; *Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 417 [185 Cal.Rptr. 654, 650 P.2d 1171].) Although the $2.887 million judgment against District is higher than the second trial ($1.947 million), we cannot say that the verdict is so grossly disproportionate as to raise a presumption of prejudice or passion. (*Schroeder v. Auto Driveaway Co.* (1974) 11 Cal.3d 908, 919, 114 Cal.Rptr. 622, 523 P.2d 662.)

## MEDICAL INSURANCE

District argues that the trial court erred in not deducting collateral source payments from the judgment. (§ 985, subd. (b).) As a District employee, Jennifer's mother received MaxiCare insurance as part of her union benefits. MaxiCare paid some ($117,116.37) but not all of Jennifer's medical bills ($437,599.45).

█ Section 985 requires that a personal injury judgment be reduced by the amount of medical services provided by a public entity defendant. (See Cal. Government Tort Liability (Cont. Ed. Bar 4th ed. 2001) § 8:59, pp. 396–397.) District, however, purchased the medical insurance as an employer. It made no contributions to Jennifer's care as a tortfeasor. (E.g., *McQuillan v. Southern Pacific Co.* (1974) 40 Cal.App.3d 802, 808 [115 Cal.Rptr. 418] [no setoff where defendant paid retirement contributions as an employer].) The medical insurance was an employer "obligation completely outside the notions of tort liability." (*Ibid.*)

District relies on another subdivision of section 985 which provides for the discretionary deduction of collateral source payments. Section 985, subdivision (f)(2) states: If the plaintiff has received payments from private medical programs or similar sources, "*the court may, after considering the totality of all circumstances and on terms as may be just,* determine what portion of the collateral source benefits will be reimbursed from the judgment to the provider of the collateral source payment, used to reduce the verdict, or accrue to the benefit of the plaintiff." (Italics added; see *Scott v. County of Los Angeles* (1994) 27 Cal.App.4th 125, 155 [32 Cal.Rptr.2d 643].)

---

[10] The juror declared that the note referred to a "discussion that occurred during deliberations during the first phase of the trial." The juror did not discuss the case before deliberating on damages and was "not aware of any other jurors violating any of the court's admonitions."

■ At the hearing on the section 985 motion, District failed to identify all of the collateral source providers and medical liens.[11] The trial court found that "not enough evidence has been presented" and that it "would be engaging in speculation to know what the liens are, what has been paid or not paid." There was no abuse of discretion. (E.g., *Garcia v. County of Sacramento* (2002) 103 Cal.App.4th 67, 82 [126 Cal.Rptr.2d 465] [Medi-Cal lien reimbursement denied because it would cause undue hardship].)

"The bottom line effect of [a] ... § 985 adjustment is that, after the appropriate reductions and set-offs are made, all 'collateral source' subrogation and lien rights terminate." (Flahavan et al., Cal. Practice Guide: Personal Injury (The Rutter Group 2002) ¶ 3:59.7, p. 3–66.) District may not invoke section 985 to prejudice the lien rights of MaxiCare and other health care providers. (See *Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 16 [84 Cal.Rptr. 173, 465 P.2d 61]; *Swanson v. St. John's Regional Medical Center* (2002) 97 Cal.App.4th 245, 247–248 [118 Cal.Rptr.2d 325] [hospital liens].)

District's remaining arguments have been considered and merit no further discussion.

The judgment is affirmed. Jennifer is awarded costs on appeal.

Gilbert, P. J., and Perren, J., concurred.

**YEGAN, J.,** Concurring.—In the first appeal to this court, the majority opinion was authored by Justice Gilbert with Presiding Justice Stone concurring. It said: "Here we hold that an open gate at a public school can be a dangerous condition of public property if it encourages students to cross at a dangerous intersection next to the school." I dissented saying, inter alia, "School districts have no duty to provide traffic protection to students walking to school." The opinion was certified for publication but was ordered not to be published by the California Supreme Court. (Cal. Rules of Court, rule 976(c)(2).) Thereafter, I adhered to the "law of the case" (see *ante*, at pp. 303–305) as the author of the majority opinions in the next two appeals (see *ante*, at p. 296). I adhere to the law of the case today.

As explained in the present majority opinion, the law has recently been settled by our Supreme Court in the *Bonanno* case. (*Bonanno v. Central*

---

[11] Jennifer incurred $437,599.45 medical expenses and claimed $105,899 future medical expenses. Her economic damages, including loss of future income, exceeded $2 million. In determining the amount to be deducted for collateral source providers, the trial court was required to consider attorney's fees and costs. (§ 985, subd. (f)(3)(C); Flahavan, et al., Cal. Practice Guide: Personal Injury, *supra*, ¶ 10.203, p. 10–54.) Costs alone were $203,129.01. Present trial counsel was retained by plaintiff after she reached majority. Given the history of the case and other factors, she agreed to a 50 percent contingency fee.

*Contra Costa Transit Authority* (2003) 30 Cal.4th 139 [132 Cal.Rptr.2d 341, 65 P.3d 807].) The letter and spirit of the *Bonanno* case can only be characterized as being consistent with Justice Gilbert's prescient first majority opinion. With the benefit of the reasoning of *Bonanno* and with some judicial hindsight, it now seems reasonable that the district's decision to maintain the open school gate substantially contributed to plaintiff's injuries even though the school district had no control over the street and the marked crosswalk. Phrased otherwise, " '[t]he matter does not appear to me now as it appears to have appeared to me then.' (Citation.)" (*McGrath v. Kristensen* (1950) 340 U.S. 162, 178 [95 L.Ed. 173, 185, 71 S.Ct. 224] (conc. opn. of Jackson, J.).)

A petition for a rehearing was denied August 4, 2003, and appellant's petition for review by the Supreme Court was denied September 17, 2003. Kennard, J., did not participate therein. Baxter, J., and Brown, J., were of the opinion that the petition should be granted.