Filed 12/10/13  Dalbroi v. Bona CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DONALD DALBROI et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CORRINE BONA, <br><br> Defendant and Respondent. | A135905 <br><br> (San Mateo County <br> Super. Ct. No. CIV488505) |

On October 19, 2006, an Acura driven by Corrine Bona was struck by another vehicle, crossed a raised median into opposing traffic, and collided with a Jeep driven by plaintiff Donald Dalbroi.  Plaintiff Dalbroi and his passenger, plaintiff Cole Strombom, filed a personal injury lawsuit against Bona.  In a trial restricted to the issue of liability, the jury found that Bona was not negligent.

Plaintiffs appeal, alleging the following errors:  (1) the jury's verdict was not supported by sufficient evidence; (2) the trial court erred by instructing the jury concerning sudden emergency; (3) the trial court ineffectually admonished the jury following an instance of attorney misconduct by Bona's counsel during closing argument; (4) the trial court improperly commented on the evidence when it instructed the jury; and (5) the court improperly allowed opinion testimony by a witness not testifying as an expert.

We agree with plaintiffs that the trial court erred by instructing the jury concerning sudden emergency and that plaintiffs were prejudiced by the error because it was reasonably probable that, absent the error, plaintiffs would have obtained a more

1

favorable result.  Accordingly, we reverse the judgment of the trial court and remand for a new trial.

## BACKGROUND

### A. *Procedural Background*

Plaintiffs filed their complaint against Bona for personal injury on October 1, 2009.[1]

On January 5, 2012, the parties stipulated to a bifurcated trial, with the issue of liability to be tried first.  On January 9, 2012, the court ordered an expedited jury trial, pursuant to Code of Civil Procedure sections 630.01 et seq., with the consent of the parties.

Following selection of a jury, presentation of evidence commenced on April 11, 2012.  The case was submitted to the jury at 2:50 p.m. on the afternoon of April 13, 2012.  The jury returned to the courtroom at 3:29 p.m. with a verdict for Bona, finding no negligence on her part.  The court filed its judgment on April 16, 2012.

Plaintiffs moved for judgment notwithstanding the verdict and for a new trial.  The trial court denied both motions.

Plaintiffs timely filed a notice of appeal on July 3, 2012.

### B. *Factual Background*

The automobile accident at issue in this case occurred on October 19, 2006, at about 3:15 p.m., in the 300 block of El Camino Real in Belmont, California.  In that block, there are two southbound lanes of traffic and two northbound lanes.  The northbound and southbound lanes are separated by a raised median with a curb that varies in width from seven to twelve feet.

Three vehicles were involved in the accident:  a Toyota Corolla driven by Jose Miranda Perez,[2] an Acura RSX driven by Bona, and a Jeep Cherokee driven by Dalbroi.

---

[1]  The complaint also named Julia Merrill as a defendant, but the case against Merrill was dismissed without prejudice on September 2, 2010.

[2]  Perez was not a party in this case, having previously settled with plaintiffs.  He did not testify.

2

When the accident occurred, Bona was 16 years old and Dalbroi was 17 years old. Neither Dalbroi nor Strombom had a recollection of how the accident happened.

Except for Bona, the only eyewitness who testified was Patricia Sabatini. She was travelling northbound on El Camino Real behind Perez's Toyota, with Bona's Acura ahead and in the lane to her left. Sabatini stated that she, the Acura, and the Toyota were all driving within the speed limit and going about the same speed. She saw the Toyota move into the Acura's lane and hit the Acura. Sabatini could not tell where the Toyota impacted the Acura. Following the impact, the Acura went to the left and she saw it go across the median. It went onto the median very quickly after the impact, approximately one or two seconds afterwards. Sabatini later testified that "It happened quickly. I mean I can't recall if it was a second or two." Sabatini did not see the Acura rotate to the right before going over the median to the left. Perez's Toyota went right, back into its lane, and continued down the road. Perez pulled over and Sabatini stopped behind him and told him he should stay.

Sabatini did not see what happened after the Acura crossed the median, but it was undisputed that it collided "near head-on" with Dalbroi's Jeep.

David Lashley, who investigated the collision for the Belmont Police Department, inspected Perez's Toyota and noted damage "to the front corner of the front bumper. In addition, the lower portion of the left fender had been forced back approximately one quarter of an inch." He also "noticed a buckle in the middle of the fender above the wheel well" and "a scuff mark and a three-inch cut in the corner of the front bumper cover." There was minor damage to the left front wheel and grease on the inside of the left front wheel. The lower portion of the left front door "was overlapping the left fender by approximately a quarter of an inch."

Lashley also inspected Bona's Acura and observed major front end damage and minor damage to the right quarter panel. He noticed grease on the right quarter panel of the Acura and minor damage to the right rear wheel well. Lashley characterized the damage to the Acura in the right rear area as "minor." He believed that the grease he

3

found on the Acura came from the Toyota because "there was nothing that would have grease on it in that portion of [the Acura]."

Bona could not remember her speed before the accident, but said that surrounding traffic moving at close to the speed limit was consistent with her recollection. The first indication she had of an accident happening was feeling "a push from my right side." She believed the impact was to the right rear portion of her car. She saw no car to her immediate right at that point. It was very sudden and she did not know what hit her. She said: "I grabbed my wheel. I literally had no time to respond. It, it happened instantly." She did not steer her car and simply held onto the wheel. She remembered going over the median and did not see Dalbroi's Jeep before they collided. The time from impact with Perez's vehicle to going over the median felt to her to be less than a second, but "it happened so instantly I couldn't give you a specific time."

Bona stated that the initial impact caught her off guard. She felt that she was in danger. Her counsel asked: "Did you feel you were in danger, that you may get hurt?" and Bona answered: "I don't even think I got to even think about it, to be honest. It just happened." Her counsel asked: "Did you feel that you were in an emergency situation?" and Bona answered: "When I was first hit I didn't have time to think of anything, but after my car had stopped spinning and everything had stopped, yes, I realized that I was in a very—I realized it was an emergency completely, yes."

Rajeev Kelkar testified for plaintiffs as an expert in the field of accident reconstruction and biomechanics. Kelkar stated that the accident began with "some contact between the left front of the Toyota Corolla and the right rear of the Acura. The Acura then comes across [the] median and has a near head-on collision with the southbound Dalbroi vehicle." Kelkar said that the initial collision between the Toyota and the Acura was a "sideswipe," which he described as a collision "in which the vehicles are traveling in, essentially, the same direction. So they have a very shallow angle between them, a shallow [*sic*] being 15 degrees or less. They have a shallow angle between them and the contact is to the side of the vehicles. So it doesn't involve an impact to the front or the rear nor does it involve a steeper angle impact to the side which

4

would be similar to a t-bone or a broadside." He said that based on his analysis, the most consistent scenario was that "the left front of the Toyota Corolla and the right rear of the Acura" were the areas where the sideswipe occurred.

Kelkar stated that sideswipes are considered "low severity or minor severity accidents." and that "the change in speed that is imposed on the vehicle in a sideswipe is typically very low. It's less than two or three miles per hour . . . ." In such a sideswipe, the vehicle that is hit would get "very, very little rotation" and that any rotation that occurred would be "slightly clockwise." The driver of the impacted car would feel the impact as a vibration, somewhat like "the sensation you feel when you are going over train tracks or if you go over a bottle." Kelkar believed that "based on the fact that the contact duration is very short and that the rotation is not significant, I believe that this vehicle could continue in a straight line following this impact and it's supported by the fact that the Toyota Corolla, in fact, does just that."

Kelkar ran numerous computer simulations "bringing these vehicles together at various speeds and in various configurations." "What I found was that, if anything, there is a slight rotation clockwise. In most cases, the vehicles just continue straight down the road as well."

Based on Kelkar's analysis, "[t]he Acura as it starts to traverse the median is approximately at about a 15-degree angle." In order to go left, toward the median, following the sideswipe, the Acura would require "a steering input." "It's the only way to create this 15-degree angle when it's going over the center median." The amount of steering input would depend on how far the Acura travelled between the sideswipe and the point it hit the median, and the testimony that it happened very quickly was not precise as to time, making it "difficult to put into a number." However, his estimate was that a 40- to 50-degree steering input would be needed.

Kelkar testified that there were scenarios in which a collision from the side could cause counterclockwise rotation, but such scenarios would not be consistent with other facts of the case, such as Bona's testimony that she saw no vehicle to her right and felt the impact to her rear.

According to Kelkar, the normal time from perceiving an unexpected event to reacting to the event is 1.5 seconds, on average. The time may be longer if there is a difficulty in perceiving the actual object itself. Actual perception to reaction times range from 0.2 seconds to 2.5 seconds. Kelkar had no basis on which to conclude how much time passed between the impact and Bona's car contacting the median. It might have been as short as 1.2 seconds or as long as 2.5 seconds.

Kelkar believed that once Bona's car was up on the median, the accident was in place and there was nothing further that Bona could do to avoid it.

Laurence Neuman testified as an expert in accident reconstruction and had been retained by the defense. Neuman stated that his analysis was very similar to Kelkar's. Neuman believed that although there were some other possibilities, the most likely scenario was that there was contact between the left front of Perez's Toyota and the right rear of Bona's Acura. Neuman also believed that the collision was a shallow angle sideswipe that would cause clockwise rotation to the Acura, if any rotation occurred. Bona likely felt something from behind that might have been a pushing sensation. If there was a movement or rotation to her vehicle, it would be to the right. Neuman agreed that in order for Bona's car to move to the left, there would have to be steering input by the driver.

Neuman did not believe that Bona steered to the left as an "overcorrection": "If it's an overcorrection you have to move to the right to start with in order to overcorrect out of it." Here there was no evidence from Bona or Sabatini that the Acura moved to the right. However, Neuman could not completely rule out overcorrection, because a slight movement to the right might not have been apparent to Sabatini. Neuman believed that a steering motion by Bona was a fast, reflexive movement. Plaintiffs' counsel asked: "And you agree there was a positive turning motion; that is, that whatever happened can't be instantaneous. It has to involve some thought and reaction, correct?" Neuman answered, "Well, there's got to be some recognition that I just got bumped or hit or whatever her feeling is and then, you know, this, what I think is kind of a reflex away from it if there is the steering. So if you mean by that, positive, then I agree." A scenario

6

in which Perez hit Bona toward the front corner of the Acura, with enough force to push her over the median, without steering input, would have been inconsistent with witness testimony and would have been the least likely possibility, but could not be ruled out completely without examination of the vehicles themselves. Neuman also believed that once Bona had entered the median, there was nothing she could have done to avoid the accident.

Defense counsel asked Neuman: "You do not believe that she had enough time to perceive or react to the situation before she was in the median; is that correct?" Neuman answered: "Correct. I think she can do a reflective, reflective [*sic*] reaction, but I don't think she [had] enough time to do what we traditionally think of perception reaction, . . . to see it, figure out what it is and decide I am going to swerve or brake."

## DISCUSSION

The court instructed the jury, in relevant part: "You have heard in this case that [Bona] claims that she was not negligent because she acted with reasonable care in an emergency situation. . . . Bona was not . . . negligent if she proves all of the following: One, that there was a sudden and unexpected emergency situation in which someone was in actual or apparent danger of immediate injury; two, that . . . Bona herself did not cause the emergency; and three, that . . . Bona acted as a reasonably careful person would have acted under similar circumstances even if it appears later that a different course of action would have been safer." This instruction is adapted from CACI No. 452, titled "Sudden Emergency."

Plaintiffs contend that it was error for the court to instruct the jury concerning sudden emergency because it was factually unsupported by the evidence. We agree.

### I. *The Court Erred In Giving The Sudden Emergency Instruction, CACI No. 452*

The standard of review when the giving of a jury instruction is alleged to be prejudicial error is familiar. "The propriety of jury instructions is a question of law that we review de novo." (*Cristler v. Express Messenger Systems* (2009) 171 Cal.App.4th 72, 82.) "An instruction correct in the abstract, may not be given where it is not supported by the evidence or is likely to mislead the jury." (*Joyce v. Simi Valley Unified School Dist.*

7

(2003) 110 Cal.App.4th 292, 303.) " ' "A reviewing court must review the evidence most favorable to the contention that the requested instruction is applicable since the parties are entitled to an instruction thereon if the evidence so viewed could establish the elements of the theory presented. [Citation.]" [Citation.]' " (*Freeze v. Lost Isle Partners* (2002) 96 Cal.App.4th 45, 53.) We examine whether evidence in this case supported the application of CACI No. 452, reviewing the evidence most favorable to its application.

The "Sudden Emergency" instruction embodied in CACI No. 452 holds a defendant to a lesser standard of care in certain emergency situations. "[U]nder the cases and the authorities, a person who, without negligence on his part, is suddenly and unexpectedly confronted with peril, arising from either the actual presence, or the appearance, of imminent danger to himself or to others, is not expected nor required to use the same judgment and prudence that is required of him in the exercise of ordinary care in calmer and more deliberate moments." *Leo v. Dunham* (1953) 41 Cal.2d 712, 714.) After a careful review of the evidence most favorable to the giving of CACI No. 452 we find that the trial court erred in giving it.

The first requirement of CACI No. 452 is that there be "a sudden and unexpected emergency situation in which someone was in actual or apparent danger of immediate injury." That the impact from Perez's Toyota was sudden and unexpected was not in dispute, so we must determine if there was evidence of actual or apparent danger.

In closing argument, the defense presented the theory that the impact from Perez's Toyota was actually such as to force Bona across the median. If that were the case, no one could deny that the situation presented actual danger. However, although Neuman was not able to rule out entirely the possibility that the Toyota had hit the Acura at the front right corner, forcing it over the median, without an examination of the vehicles, this theory was purely speculative and not supported by any evidence. It contradicted Bona's own testimony that she felt the impact in the rear and saw no vehicle to her right. The theory also left unexplained the damage to the right rear of the Acura. We conclude that the evidence did not support the proposed defense theory, and supported only the theory that Perez's Toyota sideswiped Bona's Acura in the right rear area.

8

It was the opinion of both of the expert witnesses that a sideswipe from Perez's Toyota would have caused, at most, a slight rotation to the right from which Bona could have recovered and continued ahead in her lane of travel. The defense presented no evidence to the contrary. Thus, a sideswipe collision in this case presented no actual danger. Nothing prevented Bona from continuing in her lane of traffic or from braking, pulling over to the right shoulder and examining the damage Perez caused to her car.

Because the evidence in this case did not support a finding of actual danger, we must determine whether there was evidence of apparent danger. We find none. It was Bona's unequivocal testimony that she had no time to contemplate the nature of the situation until after she had gone over the median and collided with Dalbroi's Jeep.

Because the evidence presented at trial did not support a finding of actual or apparent danger immediately following the impact by Perez's Toyota, CACI No. 452 was not supported by the evidence and it was error by the trial court to instruct the jury on sudden emergency.[3] This conclusion is supported by the "Directions for Use" of CACI No. 452, which state: "The instruction should not be given unless at least two courses of action are available to the party after the danger is perceived. (*Anderson v. Latimer* (1985) 166 Cal.App.3d 667, 675 . . . .)" Because Bona had no perception of danger until after the accident had concluded, the instruction cannot apply to Bona's actions.

## II. *Plaintiff Has Shown Prejudice From The Giving of CACI No. 452*

"[T]here is no rule of automatic reversal or 'inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission. A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.)"

---

[3] We note that the trial court also gave CACI No. 452 as part of its instructions to the jury before the presentation of evidence. Although it is within the trial court's discretion to preinstruct on substantive issues, "the appellate opinions that have impliedly 'approved' of preinstruction involved situations where counsel either expressly or by acquiescence waived any objection to the practice." (Wegner et al., Cal. Practice Guide: Civil Trials & Evidence (2013) ¶ 14.240, p. 14-55.)

(*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 (*Soule*).) "Instructional error is prejudicial where it seems probable that the error affected the verdict." (*Maureen K. v. Tuschka* (2013) 215 Cal.App.4th 519, 531; see also *Soule,* at p. 574.)

Whether a party was prejudiced by an erroneous instruction "requires evaluation of several factors, including the evidence, counsel's arguments, the effect of other instructions, and any indication by the jury itself that it was misled." (*Soule*, *supra*, 8 Cal.4th at p. 574; accord, *Veronese v. Lucasfilm Ltd.* (2012) 212 Cal.App.4th 1, 31.) " 'The determination whether, in a specific instance, the probable effect of the instruction has been to mislead the jury and whether the error has been prejudicial so as to require reversal depends on all the circumstances of the case, including the evidence and the other instructions given. No precise formula can be drawn.' " (*Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 670-671.)

In determining whether plaintiffs were prejudiced by the court giving CACI No. 452, we examine the *Soule* factors: the evidence, counsel's arguments, the effect of other instructions, and any indication by the jury itself that it was misled. Here, all of the factors either support a conclusion of prejudice or are consistent with it.

As is shown by the discussion above, the evidence centered on the facts surrounding what became a serious vehicular accident that involved personal injury. The nature of the evidence was such that a jury could, with a reasonable probability, conclude that the standard of care contained within the sudden emergency instruction applied to Bona's conduct without careful consideration of whether the facts necessary to apply that standard of care were present.

The arguments of Bona's counsel made such an outcome even more likely—we count 15 instances in defense counsel's closing argument (an average of once per page of transcript) to the "emergency situation" that confronted Bona. The impact of this repetition was heightened by defense counsel's final and improper plea: "All I ask you to

10

do when you get back into that room is put yourself into my client's shoes and just think about the situation of what has occurred here."[4]

Besides CACI No. 452, the only other instruction specifying a standard of care that the jury might apply was provided by CACI No. 700:[5] "A person must use reasonable care in driving a vehicle. Drivers must keep a lookout for pedestrians, obstacles, and other vehicles. They must also control the speed and movement of their vehicles. The failure to use reasonable care in driving a vehicle is negligence." As noted above, the import of the sudden emergency instruction is that a person confronted with imminent danger "is not expected nor required to use the same judgment and prudence that is required of him in exercise of ordinary care in calmer and more deliberate moments." (*Leo v. Dunham*, *supra*, 41 Cal.2d at p. 714.) Thus, if the jury erroneously concluded that the sudden emergency instruction applied in the case at hand, they would have been misled into applying a lower standard of care than would otherwise be applicable. No other instruction would have prevented that misapplication.

Finally, although there is no direct indication that the jury was actually misled, the jury deliberated for less than 40 minutes before reaching a verdict, an outcome we consider unlikely if the jury had determined that the sudden emergency instruction did not apply. The trial court was in accord with this assessment, stating at the hearing on plaintiff's motion for judgment notwithstanding the verdict: "It was a very, very rapid verdict. If you take out the time they took to pick a foreperson, it took them 20 minutes to decide this case, which tells me that it's likely, more likely than not here that they

---

[4] We need not decide plaintiffs' separate question of whether this "Golden Rule" argument was adequately cured by the trial court's later instruction.

[5] The jury was not instructed with CACI No. 401, "Basic Standard of Care": "Negligence is the failure to use reasonable care to prevent harm to oneself or to others. [¶] A person can be negligent by acting or by failing to act. A person is negligent if he or she does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation. [¶] You must decide how a reasonably careful person would have acted in [*name of plaintiff/defendant*]'s situation."

11

bought this emergency, you know, response defense, at least there is a good case that can be made that they did."

We conclude that, had the jury not been instructed on sudden emergency, it was reasonably probable that plaintiffs would have achieved a more favorable outcome. Because we hold that the giving of CACI No. 452 was prejudicial error we need not reach the other issues presented by plaintiff.

## DISPOSITION

The judgment of the trial court is reversed and the cause is remanded for a new trial.

_____
Brick, J.*

We concur:

_____
Haerle, Acting P.J.

_____
Richman, J.

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.